M. David Eckersley (0956)
PRINCE, YEATES & GELDZAHLER
175 East 400 South, Suite 900
Salt Lake City, Utah  84111
Telephone:  801-524-1000
mde@princeyeates.com

and

Kyle Schonekas, La. Bar No. 11817
Patrick S. McGoey, La. Bar No. 24549
Maria G. Marks, La. Bar No.23208
SCHONEKAS, EVANS, MCGOEY
& MCEACHIN, L.L.C.
650 Poydras Street, Suite 2105
New Orleans, Louisiana  70130
Telephone:  (504) 680-6050
kyle@semmlaw.com
patrick@semmlaw.com
maria@semmlaw.com

*Attorneys for all Plaintiffs*
*except Dandrea, Inc. and KMD, Inc.*

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | | |
|---|---|---|
| GULF COAST SHIPPERS LIMITED PARTNERSHIP, et al. | : | **PLAINTIFF'S STATUS REPORT FOR** |
| | : | **DECEMBER 15, 2010 CONFERENCE** |
| Plaintiffs, | : | |
| | : | Civil No. 2:09-CV-221 |
| vs. | : | |
| | : | Judge Dale A. Kimball |
| DHL EXPRESS (USA), INC., an Ohio | : | Magistrate Judge Paul M. Warner |
| Corporation, and DPWN Holdings (USA), | : | Magistrate Judge David Nuffer |
| Inc. | : | |
| | : | |
| Defendants. | : | |

Pursuant to this Court's order of November 14, 2010, the Plaintiffs provide the

following answers to the questions posed by Magistrate Judge Nuffer:

a(i)   Plaintiffs estimate that their collective damages will be between $100 - $175 million dollars, exclusive of punitive damages.[1]

(ii)   DHL's First Amended Counterclaims against 115 Plaintiffs total $8,300,253.

b(i)   It is Plaintiffs' position that their breach of contract claims against DHL are based upon the exact same facts and law as Unishippers' breach of contract claim against DHL.  The claims are almost identical, except that Plaintiffs need to prove that they were third party beneficiaries of the National Account Agreement and/or the Reseller Agreement, and they must prove their own damages, which are separate from any damages suffered by Unishippers.  Plaintiffs also assert a tort claim against DPWN which Unishippers does not assert.

(ii)   DHL's counterclaims against Plaintiffs are for unpaid shipping services. DHL previously asserted the same claims (Breach of Contract, Account Stated and Open Account) against Unishippers.[2] On April 29, 2010, Judge Kimball dismissed DHL's claims against Unishippers to the extent such claims were based on any amounts invoiced to franchisee accounts, but did not dismiss the counterclaims to the extent Unishippers owes any amount on its own account to DHL.[3] Judge Kimball's Order indicates that there is no longer any overlap in the amounts DHL claims to be due in its counterclaims in this case and the amounts DHL claims to be due in the Unishippers matter.  However, in discovery responses served by DHL on Unishippers on September 3, 2010, DHL still contended that Unishippers was responsible for paying for the unpaid shipping services provided to franchisees.  Accordingly, at this point, it is difficult for Plaintiffs to know whether or not DHL intends to attempt to prove its unpaid shipping services claim in the Unishippers trial which is set for February 28, 2011. If DHL intends to prove its entire claim for unpaid shipping services in the Unishippers case, then DHL's claims against Plaintiffs could also be duplicative of DHL's claims against Unishippers.  And even if there is no duplication of the actual amounts claimed in the two cases, there will

---

[1]   On October 29, 2010, a jury in the 3rd Judicial District for Salt Lake County, State of Utah awarded a group of twenty-five USS Logistics, L.L.C. franchisees $20,881,940 for DHL's breach of their reseller contract, and $3,573,841 for DHL's tortious interference with economic relations. On January 4, 2011, the jury will decide what, if any, punitive damages DHL must pay.  According to pleadings filed by DHL in the Unishippers case, Unishippers Franchisees averaged three times more monthly volume of shipments than sixty-five USS Logistics franchisees.  *See* Civil Action No. 08-894, Rec. Doc. 255, Declaration of Hank Gibson, ¶9.  Given this, Plaintiffs' damages may well exceed the estimates above.

[2]   *See* Civil Action No. 08-894, Rec. Doc. 118.

[3]   *Id.*, Rec. Doc. 186.

likely be identical legal issues in the cases if DHL pursues its counterclaims in both cases.

c.    Plaintiffs' electronic discovery vendor took approximately 105 GB of emails and attachments, uploaded them, and culled them by date and search terms. The vendor then imaged the results, ocr'd the data for extraction (i.e, made all documents text-searchable), deleted duplicate emails, and produced the information for review in Summation software (utilized by Plaintiffs' counsel) and Concordance software (utilized by Defendants' counsel). The vendor also bates stamped the approximately 1,000,000 pages of ESI with custom labels for each plaintiff, as requested by Defendants. Additionally, the vendor scanned hard copies documents, loaded them into Summation and Concordance files, and bates stamped them for production.

d.    The first four Plaintiffs selected by DHL for Phase One discovery had more than 105 GB of email data. Based on the relative size of the first four Plaintiffs and the remaining Plaintiffs, Plaintiffs' counsel estimates that the remaining 117 Plaintiffs likely would have five to fifteen times as much electronic data as the Plaintiffs in phase one. Plaintiffs estimate that if e-discovery is not drastically limited or eliminated, their vendor costs alone could range between $250,000 and $1,000,000.

e.    Plaintiffs do not believe that the 10,000 additional pages of emails that DHL produced in response to Plaintiffs' search terms had much value for Plaintiffs. Plaintiffs believe that most of the emails were duplicative of emails that DHL produced in the Unishippers case. For instance, in the two depositions that Plaintiffs have taken of DHL's former collection personnel (the depositions focused on DHL's counterclaims against the first four Plaintiffs selected by DHL), Plaintiffs used thirty-six emails as exhibits in those depositions. Only two of the thirty-six emails were from the 10,000 pages of emails produced by DHL in this case.[4] These two emails, however, were produced in various forms by DHL in the Unishippers' case.[5] Accordingly, the supplemental email production in this matter by DHL does not appear to have resulted in the production of many non-duplicative emails.[6]

---

[4]    *See* DHLGC0005000-0005002 and DHLGC0006377-0006379.

[5]    *See* DHLUN113686-88, DHLUN182623-27, DHLUN181538-39, DHLUN181530-34, and DHLUN102924-25

[6]    For the Court's clarification, DHL has indicated that it does not intend to run any additional email searches for the remaining 117 Plaintiffs. In the first phase of discovery, DHL refused to run electronic searches for each individual Plaintiff, contending that they would be duplicative.

f.    Plaintiffs' strongly disagree with Defendants' suggestion that Plaintiffs' counsel failed to abide by an agreement to provide hit counts in advance of the electronic production.   Plaintiffs also disagree with Defendants' suggestion that if Plaintiffs' counsel were to provide hit counts of the search results before production, then phase two discovery will be "much narrower in scope" and completed "much more quickly."

(i)    Plaintiffs and Defendants never agreed to produce hit counts for each Plaintiff.  To the contrary, the agreement to produce hit counts was for the first test Plaintiff, Kasel.  On August 11, 2010, Plaintiffs counsel provided DHL's counsel with hit counts for the "test" run of searches for the first plaintiff, Kasel.[7]   Kasel's hit count resulted in the production of over 132,000 pages of electronic documents.  At that time, Plaintiffs' counsel advised DHL's counsel that one of the first four Plaintiffs, (Gulf Coast), had "substantially more" volume of pst files than Kasel.  *Id*., p. 3. Plaintiffs' counsel specified the volume of each plaintiff's e-mail files, stating that Kasel had 32.5 GB of data, while the remaining three plaintiffs had 6 GB, 10 GB, and 98 GB of data, respectively.[8]   Given the obviously large size of the production, Plaintiffs' counsel asked DHL's counsel if they wanted to "revise your list of proposed search terms."[9]

DHL's counsel responded that: "these results appear acceptable," and instructed Plaintiffs to run the searches for all four plaintiffs.[10]  On August 12, 2010, Plaintiffs vendor began running those searches.  There was never an agreement to provide future hit counts or to modify searches based upon future hit counts.  To the contrary, on August 12, 2010, DHL's counsel instructed Plaintiffs to produce "emails using the searches provided."[11]  To the extent Plaintiffs' counsel provided hit counts for any other plaintiffs, it was out of professional courtesy in order to allow counsel to estimate the amount of time that might be required for review of the resulting documents.  It is simply not true that Plaintiffs counsel breached any agreement with defense counsel regarding hit counts or revised search terms.

(ii)    DHL's suggestion that providing hit counts in the future for the remaining plaintiffs will somehow reduce the burdens on Plaintiffs and speed up the discovery process is also not accurate.  In essence, DHL is now proposing

---

[7]     *See* Exhibit "1," pp. 1-3.

[8]     *Id.*

[9]     *Id*.

[10]    *Id*., p. 1.

[11]    *Id.*

4

that Plaintiffs should do e-discovery twice *for each of the remaining 117 Plaintiffs*.  DHL suggests that Plaintiffs' counsel should:

a.      Search all of their clients' emails for the search terms that DHL and Plaintiffs have previously agreed to;

b.      Give DHL individual hit counts for each search, so that DHL can then "revise the search terms;" and

c.      Then have Plaintiffs' vendor re-run searches using DHL's modified searches.

While this newly proposed process might limit the information that Plaintiffs ultimately produce, it will increase Plaintiffs' vendor's work and costs.  DHL is essentially suggesting that each of the remaining 117 plaintiffs' e-mail files will be searched multiple times, and that the parties may end up with 117 *separate* sets of search terms.  In addition to increasing vendor time and costs, this proposal would significantly increase the amount of time and effort required by counsel to negotiate each of the 117 sets of search terms, and would render this first phase of discovery pointless.  Additionally, DHL's counsel has failed to identify how future e-discovery will be limited.  DHL's counsel thought that Kasel's production of 132,000 documents was "acceptable."[12]  If the remaining 117 Plaintiffs each had 132,000 pages of emails, then DHL is asking the court to have Plaintiffs produce over 15,000,000 pages of electronic discovery.

Before production of any ESI, Plaintiffs' counsel thought that ESI production could be duplicative and not needed.  On September 1, 2010, Plaintiffs counsel wrote to defense counsel, stating:

> I must point out that the fact that you are willing to proceed with the Plaintiffs' depositions before receiving the results of the email searches strongly indicates that you do not believe the results of those email searches to be relevant.  It is my understanding that Unishippers has already produced to you all of my clients' emails with Unishippers corporate representatives. That, coupled with Khai's statement on our August 23, 2010 conference call that he only needed my clients' "financial information" prior to taking their depositions, leads me to believe that this ESI production maybe a

---
[12]      *See* Exhibit "1," p. 1.

5

waste of time.  If that is the case, we can save everyone a huge amount of time, energy, and effort by foregoing future email searches or significantly curtailing them.[13]

As shown by the results of the Phase One discovery, Plaintiffs believe that future ESI production is irrelevant, duplicative, costly, and should not be conducted.  If DHL insists on future ESI production on the same basis as phase one discovery, DHL should be required to pay the costs to search and produce the ESI.

Respectfully submitted,

*/s/ Patrick S. McGoey*
Kyle Schonekas, La. Bar No. 11817
Patrick S. McGoey, La. Bar No. 24549
Maria G. Marks, La. Bar No. 23208
SCHONEKAS, EVANS, MCGOEY
& MCEACHIN, L.L.C.
650 Poydras Street, Suite 2105
New Orleans, Louisiana  70130
Telephone:  (504) 680-6050
kyle@semmlaw.com
patrick@semmlaw.com
maria@semmlaw.com

*Attorneys for all Plaintiffs*
*except Dandrea, Inc. and KMD, Inc.*

---

[13]     *See* Exhibit "2."

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 8th day of December, 2010, I caused to be served via Court's ECF electronic filing system the foregoing Plaintiff's Status Report for December 15, 2010 Conference to the following:

- **Blaine J. Benard**
  blaine.benard@hro.com,tish.howell@hro.com
- **M. David Eckersley**
  mde@princeyeates.com,geniel@princeyeates.com,docket@princeyeates.com
- **Khai LeQuang**
  klequang@orrick.com,nsweeney@orrick.com,ewestermeyer@orrick.com
- **Patrick S. McGoey**
  patrick@semmlaw.com,rachel@semmlaw.com
- **William W. Oxley**
  woxley@orrick.com,sspencer@orrick.com
- **Christopher S. Ruhland**
  cruhland@orrick.com,nsweeney@orrick.com,ewestermeyer@orrick.com
- **Kyle D. Schonekas**
  kyle@semmlaw.com,jennifer@semmlaw.com
- **Andrea V. Timpa**
  andrea@semmlaw.com,andi@semmlaw.com,rachel@semmlaw.com
- **Edwin V. Woodsome , Jr**
  ewoodsome@orrick.com,nsweeney@orrick.com,ewestermeyer@orrick.com
- **Maria G. Marks**
  maria@semmlaw.com, rachel@semmlaw.com

*/s/ Patrick S. McGoey*
Patrick McGoey

7

1659.Plaintiffs.Status.Report.12.15.10.conf