M. David Eckersley (0956)
PRINCE, YEATES & GELDZAHLER
175 East 400 South, Suite 900
Salt Lake City, Utah  84111
Telephone:  801-524-1000
mde@princeyeates.com

and

Kyle Schonekas, La. Bar No. 11817
Patrick S. McGoey, La. Bar No. 24549
Maria Marks, La. Bar No. 23208
SCHONEKAS, EVANS, MCGOEY
& MCEACHIN, L.L.C.
650 Poydras Street, Suite 2105
New Orleans, Louisiana  70130
Telephone:  (504) 680-6050
kyle@semmlaw.com
patrick@semmlaw.com
maria@semmlaw.com

*Attorneys for all Plaintiffs*
*except Dandrea, Inc. and KMD, Inc.*

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | | |
|---|---|---|
| GULF COAST SHIPPERS LIMITED PARTNERSHIP, et al. | : : : : | **MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE THIRD-PARTY BENEFICIARY ISSUE** |
| Plaintiffs, | : : | |
| vs. | : : | **Oral Argument Requested** |
| DHL EXPRESS (USA), INC., an Ohio Corporation, and DPWN Holdings (USA), Inc. | : : : | Civil No. 2:09-CV-221 Judge Dale A. Kimball Magistrate Judge Paul M. Warner |
| Defendants. | : | |

1

Phase One Trial Plaintiffs AEA Services, Inc. ("AEA"), Gulf Coast Shippers Limited Partnership ("Gulf Coast"), Kasel Enterprises, L.L.C. ("Kasel"), and Lake Country Logistics, L.L.C. ("Lake Country") respectfully submit this Memorandum in Support of their Motion for Partial Summary Judgment on the Third-Party Beneficiary Issue.

## INTRODUCTION

The 121 Plaintiffs in this matter are franchisees of Unishippers Global Logistics, LLC ("Unishippers"), all of whom used to market and resell DHL's shipping and freight services to their customers across the United States.  Plaintiffs sold DHL's services pursuant to the terms of a 1994 National Account Agreement and Reseller Agreement (collectively "the Agreements").

Plaintiffs allege, *inter alia*, that DHL's actions surrounding its exit from the U.S. domestic market caused them significant harm and constituted breaches of the Agreements. Plaintiffs further allege that they are third party beneficiaries of the Agreements, with authority to enforce the Agreements against DHL.  In this Motion for Partial Summary Judgment, plaintiffs AEA, Gulf Coast, Kasel, and Lake Country ask the Court to conclude, as a matter of law, that they are third party beneficiaries of the National Account Agreement and the Reseller Agreement.

This motion presents a straightforward question of contract interpretation.  The contracts at issue are clear and unambiguous.  This Court need only look to the terms of the contracts to conclude that Unishippers franchisees are intended third party beneficiaries of the agreements.  The unambiguous terms of the National Account Agreement and the Reseller Agreement clearly and overwhelmingly demonstrate that the contracting parties intended to provide substantial benefits directly to the franchisees.  In the agreements, DHL voluntarily assumed numerous duties to the franchisees.  DHL agreed to provide its services *directly* to the franchisees for resale.  DHL agreed to allow the franchisees to resell its services.  DHL gave

2

specialized pricing directly to the franchisees, billed the franchisees directly, collected payment directly from the franchisees, and had contractual rights to default the franchisees individually and separately if the franchisees did not comply with their obligations.   Moreover, the agreements expressly stated and acknowledged that the franchisees had *rights* under the Agreements and that the franchisees had a *direct* contractual relationship with DHL.

Because the undisputed facts demonstrate that AEA, Gulf Coast, Kasel, and Lake Country were Unishippers franchisees at the time DHL allegedly breached the Agreements, this Court should conclude, as a matter of law, that these four plaintiffs are third party beneficiaries of the National Account Agreement and the Reseller Agreement, with rights to enforce those agreements.

## STATEMENT OF UNDISPUTED FACTS

1.      Unishippers Global Logistics, LLC is a Delaware limited liability company with its principal place of business in Salt Lake City, Utah.  (*See* Rec. Doc. 67, Second Supplemental and Amended Complaint ("Complaint"), at ¶ 11; Rec. Doc. 72, DHL Express (USA), Inc.'s and DPWN Holdings (USA), Inc.'s Answer to Plaintiffs' Second Supplemental and Amended Complaint ("Answer"), at ¶ 11; Rec. Doc. 73, DHL Express (USA), Inc.'s First Amended Counterclaims ("Counterclaim"), at ¶ 1.)

2.      DHL Express (USA), Inc. is an Ohio corporation, with its principal place of business in Plantation, Florida.  (*See* Rec. Doc. 67, Complaint, at ¶ 2; Rec. Doc. 72, Answer, at ¶ 2; Rec. Doc. 73, Counterclaim, at ¶ 1.)

3.      DHL and Unishippers are parties to a National Account Agreement dated September 21, 1994, as successors to the original signatories, Airborne and Unishippers

Association, Inc.  (*See* Rec. Doc. 72, Answer, at ¶ 19; National Account Agreement, at p. 1, attached hereto as Exhibit A; Reseller Agreement, at p. 1, attached hereto as Exhibit B.]

    4.    The parties to the National Account Agreement expressly provided that Unishippers Franchisees[1] would receive the following separate and distinct benefits from the National Account Agreement:

    a.    "AIRBORNE[2] will provide to USA,[3] USA Franchisees and USA Accounts Transportation Services subject to the conditions of this Agreement."  (Exhibit A, at § 3.01.)

    b.    The parties agree the intent of the Customer Discount Program under this Agreement is to authorize … USA Franchisees to engage in marketing activities to attract new customers."  (Exhibit A, at § 4.04.)

    c.    "AIRBORNE agrees to deal with … USA Franchisees … at service levels consistent with other AIRBORNE customers."  (Exhibit A, at § 5.04.)

    d.    "AIRBORNE agrees to deal with … USA Franchisees in good faith in all aspects of this Agreement and to provide USA shipping rates consistent with market trends and conditions."  (Exhibit A, at § 5.05.)

    e.    ". . . AIRBORNE will provide … USA Franchisees with weekly billing information necessary to bill USA Customer Accounts by Electronic Data Interchange (EDI)."  (Exhibit A, at § 5.06.)

    f.    "AIRBORNE will make no representations or warranties relating to … USA Franchisees, … except as set forth in this Agreement or as otherwise authorized by USA in writing."  (Exhibit A, at § 5.07.)

    g.    "AIRBORNE will advise … USA Franchisees, in writing, of any restrictions on marketing the Customer Discount Program, which may include, but are not limited to, commodities or type of businesses prohibited."  (Exhibit A, at § 5.08.)

---

[1]    The National Account Agreement defines Unishippers Franchisees as "Businesses and/or individuals who have entered into a contractual agreement with USA to operate a USA Franchise."

[2]    Because DHL is the successor to Airborne, any reference to "Airborne" in the National Account Agreement is a reference to DHL.

[3]    The National Account Agreement uses the abbreviation "USA" to refer to Unishippers Association, Inc., the predecessor to Unishippers.  Therefore, any reference to "USA" in the National Account Agreement is a reference to Unishippers.

4

h.  Additionally AIRBORNE agrees it will not offer USA Franchisees any Transportation Services not covered by this Agreement, or any other Transportation Services offered by or arranged through Airborne [sic], directly or indirectly during the term of this Agreement, without authorization from USA."  (Exhibit A, at § 5.09.)

i.  "AIRBORNE may … terminate credit privileges of a USA Franchisee under this Agreement and place that USA Franchisee Account on Cash Basis Only for failure by the USA Franchisee to make payments to AIRBORNE as specified in Section 14, provided USA and the USA Franchisee are given opportunities to cure as specified therein."  (Exhibit A, at § 7.01.)

j.  "AIRBORNE agrees that each of the above conditions for termination of credit privileges apply separately to each USA Franchisee and that the notification of the intent to terminate the credit privileges of one USA Franchisee under this Section due to breach will not affect this Agreement with respect to USA and/or the balance of the USA Franchisees in compliance with the terms and conditions of this Agreement."  (Exhibit A, at § 7.02.)

k.  "AIRBORNE grants … USA Franchisees a revocable, limited, royalty free license subject to the terms and conditions of this Agreement to use in connection with the Customer Discount Program under this Agreement, the trademark, tradenames and logos used by AIRBORNE to identify its Transportation Services including the use of sales and packaging materials used by AIRBORNE.  …  The license shall terminate immediately upon termination of this Agreement … and USA Franchisees shall immediately cease using AIRBORNE's logo, tradenames or trademark immediately upon termination.  In the use of such trademarks, tradenames, logos and materials, … USA Franchisees shall, in each instance, conspicuously disclose that they are acting as an independent contractor and not as agent or employee for AIRBORNE."  (Exhibit A, at § 9.01.)

l.  "A reasonable quantity of shipping supplies (i.e. letter envelopes, packs, boxes, tubes, domestic and international airbills, service guides and other supplies) will be provided by AIRBORNE, at no charge, to … USA Franchisees, and their sales representatives upon request."  (Exhibit A, at § 10.01.)

m.  "AIRBORNE agrees to bill and collect from USA Franchisees directly via EDI."  (Exhibit A, at § 12.02.)

n.  "AIRBORNE agrees to place drop boxes for … USA Franchisees in circumstances where the current AIRBORNE policy and minimums established for drop box placement can be demonstrated by USA and/or a USA Franchisee.  (Exhibit A, at § 13.01.)

o.   "The parties acknowledge and agree that … USA's Franchisee's relationship with AIRBORNE is that of an independent contractor and not an agent, servant or employee of AIRBORNE."  (Exhibit A, at § 15.03.)

5.   The parties to the National Account Agreement expressly obligated Unishippers Franchisees to DHL, in the following respects:

a.   "USA Franchisees will not knowingly market to existing AIRBORNE Customers on Cash Basis Only (CBO) status with AIRBORNE, shippers with more than twenty percent (20%) deliveries to private residences, or any other shipper which AIRBORNE restricts its sales force from soliciting unless authorized by AIRBORNE."  (Exhibit A, at § 4.05.)

b.   "USA Franchisees will follow the guidelines for Advertising and Promotion set forth in the 'Airborne Express Advertising and Promotion Policy for Resellers' attached hereto as Attachment 'D' and made a part of this Agreement."  (Exhibit A, at § 4.08.)

c.   "USA Franchisees will not employ nor provide any direct economic compensation to Airborne employees, part-time or full time, agents or contractors to Airborne without specific Airborne Freight Corporation approval."  (Exhibit A, at § 4.09.)

d.   "All invoices from AIRBORNE to … USA Franchisees will be due and payable within thirty (30) from the date invoiced.  AIRBORNE agrees to bill USA Franchisees directly."  (Exhibit A, at § 12.01.)

e.   "All invoices from AIRBORNE to … USA Franchisees must be paid within thirty (30) days or the following shall apply.  (a)  AIRBORNE shall give notice of delinquency to USA and the delinquent USA Franchisee.  (b) Failure by the delinquent USA Franchisee to cure the delinquency within fifteen (15) calendar days shall result in a final demand notice from AIRBORNE to USA and the delinquent USA Franchisee.  (c)  If USA or the delinquent USA Franchisee does not cure the delinquency within fifteen (15) calendar days after the issuance of the final demand notice AIRBORNE may terminate the rights of the delinquent USA Franchisee under this Agreement.  (d)  AIRBORNE agrees that each of the above conditions for termination apply separately to each USA Franchisee and a termination under this Section of one USA Franchisee due to breach will not affect USA and/or the balance of the USA Franchisees in compliance with the terms and conditions of this Agreement.  (e) In the event a USA Franchisee defaults, AIRBORNE agrees to send USA Corporate Headquarters copies of all actions against the USA Franchisee."  (Exhibit A, at § 14.01.)

6.      DHL and Unishippers entered into a Reseller Agreement dated October 6, 2008. (*See* Rec. Doc. 72, Answer, at ¶ 62; Exhibit B, at p. 1.)

7.      The parties to the Reseller Agreement clearly intended that Unishippers Franchisees would receive separate and distinct benefits from the Reseller Agreement, as evidenced by the following provisions of the Reseller Agreement:

      a.      "If any RESELLER franchisee disparages DHL or the Services, or knowingly misrepresent DHL or the Services in any way following written notice from DHL to cease and desist, DHL may terminate providing the Services under this Agreement for such RESELLER franchisee."  (Exhibit B, at § 3.03.)

      b.      "Except as specifically altered by the provisions above, all other terms and conditions of the AFC-USA Contract [the National Account Agreement dated September 21, 1994] shall apply."  (Exhibit B, at p. 3.)

8.      Plaintiff AEA Services, Inc. has been a Unishippers Franchisee from 2007 to the present.  (*See* Exhibit C, Rec. Doc. 72, at ¶1.).

9.      Plaintiff Gulf Coast Shippers Limited Partnership has been a Unishippers Franchisee from 1996 to the present.  (*See* Exhibit D, Rec. Doc. 72, at ¶1.).

10.     Plaintiff Kasel Enterprises, L.L.C. has been a Unishippers Franchisee from 1996 to the present.  (*See* Exhibit E, Rec. Doc. 72, at ¶1.).

11.     Plaintiff Lake Country Logistics, L.L.C. has been a Unishippers Franchisee from 2002 to the present.  (*See* Exhibit F, Rec. Doc. 72, at ¶1.).

## LAW AND ARGUMENT

I.  **THIS COURT SHOULD GRANT PARTIAL SUMMARY JUDGMENT FINDING THAT AEA, GULF COAST, KASEL, AND LAKE COUNTRY ARE THIRD PARTY BENEFICIARIES OF THE NATIONAL ACCOUNT AGREEMENT AND THE RESELLER AGREEMENT.**

   A.  **Legal Standard.**

       1.  **Summary Judgment Is Appropriate on the Question of Third-Party Beneficiary Status.**

Summary judgment is appropriate on any claim or defense, or part of any claim or defense, "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The 2010 Amendments to the Federal Rules of Civil Procedure expressly adopt the notion of "partial summary judgment," and the Advisory Committee Notes make clear that "summary judgment may be requested not only as to an entire case but also as to a claim, defense, or part of a claim or defense." Fed. R. Civ. P. 56, Advisory Committee Notes (2010).

In this case, Plaintiffs seek summary judgment on an element of their breach of contract claims against DHL – the question whether they, as Unishippers Franchisees, are third party beneficiaries of the National Account Agreement and the Reseller Agreement. The question of whether a third party beneficiary status exists "is determined by examining a written contract," and "can be decided on summary judgment as a question of law." *Am. Towers Owners Ass'n, Inc. v. CCI Mech., Inc.*, 930 P.2d 1182, 1188 (Utah 1996).

As with any question of contract interpretation, the Court's first step is to examine the language of the contract. If the terms of the contract are unambiguous, the inquiry stops at the four corners of the contract; there is no need to examine extrinsic evidence, and the "'court determines the parties' intentions from the plain meaning of the contractual language as a matter of law.'" *Innerlight, Inc. v. Matrix Group, LLC*, 214 P.3d 854, 857 (Utah 2009) (internal

citations omitted).  When contract language is unambiguous, the Court may resolve questions of contract interpretation on summary judgment.

If, and only if, contract language is ambiguous, courts may consider extrinsic evidence of the parties' intent.  *See Cafe Rio, Inc. v. Larkin-Gifford-Overton, LLC*, 207 P.3d 1235, 1240 (Utah 2009).  A contract term or provision is ambiguous only "'if it is capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies.'"  *Café Rio, Inc.*, 207 P.3d at 1240.  Importantly, "words and phrases do not qualify as ambiguous simply because one party seeks to endow them with a different interpretation according to his or her own interests."  *Saleh v. Farmers Ins. Exch.,* 133 P.3d 428, 433 (Utah 2006).  If the relevant contract language is ambiguous, and the court considers extrinsic evidence, summary judgment still is appropriate "if the evidence, when viewed in the light most favorable to the nonmoving party, leaves no genuine issues of fact to be resolved." *Peterson v. Sunrider Corp.*, 48 P.3d 918, 927 (Utah 2002).

The Court need not consider extrinsic evidence to decide this Motion.  The contracts at issue are clear and unambiguous on the issue of the franchisees' third party beneficiary status.  Therefore, the Court need not look beyond the four corners of the Agreements to conclude that the Unishippers Franchisees are intended beneficiaries of the contracts.

    **2.**    **Third Party Beneficiaries are Persons Who Have an Enforceable Interest in the Performance of a Contract Because the Contracting Parties Intended Them to Receive a Distinct Benefit From the Contract.**

Third-party beneficiaries are persons who have an enforceable interest in the performance of a contract, even though they are not formal parties to the contract.  *See, e.g., Am. Sur. Co. of N.Y. v. Smith*, 130 So. 440, 441 (Fla. 1930).  In determining whether a person is a

third-party beneficiary of a contract, "'the predominant inquiry . . . is whether the contracting parties clearly intended the third party to receive a separate and distinct benefit from the contract.'" *Hermansen v. Tasulis*, 48 P.3d 235, 239 (Utah 2002) (internal citations omitted). This standard is the same in Utah, Florida, and Washington.[4]   *See, e.g., Vencor Hospitals v. Blue Cross Blue Shield of Rhode Island*, 169 F.3d 677, 680 (11th Cir. 1999) (applying Florida law to hold: "A party has a cause of action as a third-party beneficiary to a contract if the contracting parties express an intent primarily and directly to benefit that third party (or a class of persons to which that third party belongs)."); *Lewis v. Boehm*, 947 P.2d 1265, 1268 (Wash. Ct. App. 1997) ("To determine if a third-party beneficiary exists the court should consider the terms of contract and determine if performance of the contract necessarily and directly benefits a third party.").  A leading Florida Supreme Court opinion summarized the doctrine:

> Where . . . it is manifest from the nature or terms of a contract that the formal parties thereto intended its provisions to be for the benefit of a third party, as well as for the benefit of the formal parties themselves, the benefit to such third party being the direct and primary object of the contract, or amongst such objects, such third party may maintain an action on the contract even though he be a stranger to the consideration.

---

[4]   The National Account Agreement was negotiated and signed in Washington and/or Utah, the states where the parties had their primary places of business. Rec. Doc. 67, Complaint, at ¶ 11; Rec. Doc. 72, Answer, at ¶ 11; Rec. Doc. 73, Counterclaim, at ¶ 1.  The Reseller Agreement was negotiated and signed in Utah and/or Florida, the states where the parties had their primary places of business.  *See* Rec. Doc. 67, Complaint, at ¶ 2; Rec. Doc. 72, Answer, at ¶ 2; Rec. Doc. 73, Counterclaim, at ¶ 1.  Therefore, this Court should apply the substantive law of Utah, Washington, or Florida to questions of contract interpretation in this case.  *See, e.g., Cincinnati Ins. Co. v. Linford Bros. Glass Co.*, 2:08-CV-387-TC, 2010 WL 520490, at *1-2 (D. Utah Feb. 9, 2010) (Utah choice of law rules, applicable in a diversity case in Utah federal court, provide that the most important factors in determining the state with the most significant relationship to a contract are the place of contracting and the place where the parties are domiciled or do business).

However, this Court need not make a determination regarding the applicable law at this stage of the proceedings, because all three states apply the same basic standard for determining the existence of a third party beneficiary.  Indeed, a Florida Court applying Florida law to a third party beneficiary issue stated it was "confident that the basic principles of contract law on which this opinion rests are equally applicable in . . . *any other common law jurisdiction.*"  *Vencor Hospitals v. Blue Cross Blue Shield of Rhode Island*, 169 F.3d 677, 680 n.4 (11th Cir. 1999) (emphasis added) (applying Florida law rather than Rhode Island law, but acknowledging that there was no material difference between the two).

*Am. Sur. Co. of N.Y.*, 130 So. at 441.

The clearest and simplest way to determine whether the contracting parties intended that another person receive a benefit pursuant to the contract is to examine the contract to determine whether "the promisor has undertaken to render performance directly to the beneficiary"; in such cases, "the intent to benefit the third party will be clearly manifested."  13 Williston on Contracts § 37:8 (4th ed.).  The Washington Supreme Court echoed this principle, holding:

> "If the terms of the contract *necessarily require the promisor to confer a benefit upon a third person*, then the contract, and hence the parties thereto, *contemplate a benefit to the third person* . . . . The 'intent' which is a prerequisite of the beneficiary's right to sue is 'not a desire or purpose to confer a particular benefit upon him,' nor a desire to advance his interests, but an *intent that the promisor shall assume a direct obligation to him*."

*Lonsdale v. Chesterfield*, 662 P.2d 385, 389-90 (Wash 1983), quoting *Vikingstad v. Baggott*, 46 Wash. 2d 494, 496-97, 282 P.2d 824 (Wash 1955) (alteration in original).

The third party need not be identified by name, or even identifiable, at the time of contracting in order to be an intended beneficiary.  "'It is enough that he be identified at the time performance is due.'" *Vencor Hospitals*, 169 F.3d at 680 n.5, citing 4 Arthur Linton Corbin, *Corbin on Contracts* § 781 (1951).  For example, in *Vencor Hospitals*, an insurance contract provided that the insurer had the option of paying benefits "to the doctor, hospital or to [the insured] directly." *Vencor Hospitals*, 169 F.3d at 680.  The court concluded that a hospital that had provided covered services to the insured was a third-party beneficiary of the insurance contract:  "[b]y providing for payment directly to the hospital, the contracting parties showed a clear intent to provide a direct benefit to Vencor (or any other service-providing hospital)." *Id.* at 680.  Indeed, as the court stated, "[i]t would be hard to imagine a more direct benefit under a contract that the receipt of large sums of money." *Id*.  It was irrelevant that the hospital had not

11

been identified by name at the time the contract was entered.  It was also irrelevant whether the contracting parties knew of the identity or existence of the hospital at the time the contract was entered.  It was enough that the hospital could be identified at the time performance was due under the contract.

**B.     The National Account Agreement and the Reseller Agreement Unambiguously Demonstrate that Unishippers Franchisees are Third Party Beneficiaries of the Agreements.**

The terms of the National Account Agreement are unambiguous; the meaning of the contract cannot be disputed.  Unishippers Franchisees are referenced scores of times throughout the agreement, wherein the contracting parties expressly directed separate and significant benefits to the Unishippers franchisees.  The agreement unambiguously expresses the contracting parties' intention that the franchisees have a direct contractual relationship with DHL, and DHL agreed to deal directly with the franchisees pursuant to the agreement.  The agreement also unambiguously states that the franchisees had rights and obligations *under the agreement*.  In 2008, DHL and Unishippers entered the Reseller Agreement, wherein they adopted all but one of the scores of provisions in the National Account Agreement demonstrating the parties' intent that the franchisees would be third party beneficiaries.  In so doing, the parties reaffirmed and reemphasized their intent that the franchisees would have enforceable rights in the contracts.

**1.     The National Account Agreement and the Reseller Agreement Provide that the Franchisees Shall Receive Separate and Direct Benefits Pursuant to the Agreements.**

The core of the National Account Agreement is DHL's provision of transportation services at a discounted price for purposes of resale to end-users.  The contract explicitly and unambiguously states that DHL will provide transportation services pursuant to the agreement to

12

Unishippers Franchisees, and that the agreement will apply to all shipments tendered to DHL by Unishippers Franchisees.   Exhibit A, at § 3.01.   In fact, DHL "agrees it will not offer [Unishippers] Franchisees any Transportation Services *not covered by this Agreement*."   Exhibit A, at § 5.09 (emphasis added).   DHL acknowledges, as it must, that it provided transportation services to the Unishippers Franchisees.   *See, e.g.*, Rec. Doc. 73, Counterclaim, at ¶¶ 4, 121, 125-127.   By the clear terms of the contract voluntarily entered into by DHL, those services were *covered by the Agreement*.

When a contract provides that the promisor will deliver a product to a third party, the third party is a third party beneficiary with rights to enforce the contract.   *See, e.g., Goodell v. K.T. Enterprises, Ltd.*, 394 So. 2d 1087, 1088-89 (Fla. Ct. App. 1981).   The parties to the Agreement expressly stated their intent that the Franchisees would receive, pursuant to the contract, the authority to engage in marketing activities to attract new customers for DHL's transportation services.   *See* Exhibit A, at §§1.06, 4.04.   Thus, the core arrangement at the center of the National Account Agreement – the provision of transportation services by DHL and the marketing of those services for resale – was designed and intended to benefit Unishippers Franchisees.

It is common for franchisees to be third-party beneficiaries of a contract between their franchisor and a supplier.   For example, the case *Oil Express National, Inc. v. Burgstone*, 958 F. Supp. 366 (N.D. Ill. 1997), arose out of a contract entered into by Oil Express National, a quick oil change franchisor, and CITGO Petroleum Corporation.   *Id.* at 368.   In the contract, "Citgo agreed to sell Oil Express and participating franchisees petroleum products for prices determined in the contract."   *Id.* at 372.   In addition, the contract obligated Citgo to collect a certain amount of money from participating franchisees and distribute the funds to an Oil

Express Advertising Fund.  *Id*. The contract stated that the fund "'shall be used by Oil Express for payment of the advertising services performed on behalf of Oil Express or its franchisees.'" *Id*. at 372.  The franchisees urged that they were third-party beneficiaries of the Oil Express-Citgo contract, and argued that Oil Express had breached the contract by failing to use the funds for advertising.  The court applied a legal standard identical to the standard applied in Utah, Florida, and Washington.  *Id*. at 372 ("third-party beneficiary status 'is a matter of divining whether the contracting parties intended to confer a benefit upon a nonparty to the agreement'") (internal citations omitted).  The court concluded that "[t]he face of the supply agreement between Citgo and Oil Express clearly makes franchisees beneficiaries of the contract, and we therefore find that the defendants are beneficiaries under this contract."  *Id*. at 372.  The court emphasized that the "[f]ranchisees are clearly to benefit from this agreement through the expenditure of money by Oil Express on advertising.  Therefore, the contract itself states that franchisees . . . are to benefit from it."  *Id*. at 372.

The unambiguous and undisputed fact that DHL agreed to provide transportation services directly to the Unishippers Franchisees pursuant to the National Account Agreement is sufficient to establish that the franchisees were intended third-party beneficiaries of the National Account Agreement.  "[T]he contract itself states that franchisees . . . are to benefit from it."  *Id*. at 372.  Moreover, there are numerous additional unambiguous provisions of the agreement that support this conclusion.

First, the National Account Agreement expressly states that DHL would provide the franchisees with certain tools for marketing DHL transportation services.  For example, DHL

> grants … [Unishippers] Franchisees a revocable, limited, royalty
> free license subject to the terms and conditions of this Agreement
> to use in connection with the Customer Discount Program under
> this Agreement, the trademark, tradenames and logos used by

14

[DHL] to identify its Transportation Services including the use of
sales and packaging materials used by [DHL].

Exhibit A, at § 9.01.  This section of the National Account Agreement demonstrates the parties'
intent that DHL would grants a substantial benefit directly to the franchisees – a license to use
DHL's trademark, tradenames, and logos.

In addition, DHL agrees to provide products directly to the franchisees:  "A
reasonable quantity of shipping supplies (i.e. letter envelopes, packs, boxes, tubes, domestic and
international airbills, service guides and other supplies) will be provided by [DHL], at no charge,
to … [Unishippers] Franchisees and their sales representatives upon request."  Exhibit A, at §
10.01.  DHL also expressly and unambiguously "agrees to place drop boxes *for … [Unishippers]
Franchisees*."  Exhibit A, at § 13.01 (emphasis added).

These facts are analogous to the situation that arose in *Bohannon v. Korea
Wonyang Fisheries Co.*, *Ltd.,* Nos. 87-4255, 87-4300, 877 F.2d 64 (9th Cir. June 15, 1989), 1989
WL 67118 (unpublished),[5] a case applying Washington law.  In that case, three companies had
entered a fish processing agreement.  Fish Producer Associates, Inc. ("FPA") agreed to produce
fish "through the efforts of independent American fishermen."  *Id.* at *1.  Korea Wonyang
Fisheries Co., Ltd. agreed to "provide 'particular processing vessels, communications equipment,
technicians and Korean-English dictionaries' for the benefit of the American fisherman."  *Id.* at
*3.  One of the American fisherman hired by FPA sued for breach of the contract, and the court
concluded that he was an intended third-party beneficiary.  *Id.* at *3.  (unpublished).  In
*Bohannon* and the present case, the contract provides that third parties will do work under a
contract, and the contracting parties agree to provide tools and/or services related to that work for

---

[5]        This unpublished case is cited for its persuasive value.  *See* DUCivR 7-2.

the benefit of the third parties. As a consequence, in both *Bohannon* and the present case, the third parties are intended beneficiaries of the contract.

The National Account Agreement went further than simply providing shipping services to the franchisees and the tools for the franchisees to resell those services. DHL made a series of commitments directly to the franchisees in connection with their relationship. DHL agreed not to solicit the franchisees' customers, *see* Exhibit A, at §§ 5.09 and 1.03; to deal with the franchisees at service levels consistent with other customers, Exhibit A, at § 5.04; to advise the franchisees in writing of any restrictions on marketing pursuant to the contract, Exhibit A, at § 5.08; and to "make no representations or warranties relating to . . . [the] Franchisees . . . except as set forth in this Agreement or as otherwise authorized by [Unishippers] in writing," Exhibit A, at § 5.07. Furthermore, DHL "*agrees to deal with . . . [Unishippers] Franchisees in good faith in all aspects of this Agreement*." Exhibit A, at § 5.05. In each of these provisions, DHL "has undertaken to render performance directly to the" franchisees. *See* 13 *Williston on Contracts* § 37:8 (4th ed.). DHL's "intent to benefit" the franchisees *in all aspects of the Agreement* "[is] clearly manifested." *Id*.

The Reseller Agreement unambiguously reaffirms and reemphasizes the contracting parties' intent to confer benefits on the franchisees. First, the Reseller Agreement adopts all of the terms of the National Account Agreement that were not explicitly amended or deleted by the Reseller Agreement. Exhibit B, at p. 3. Therefore, because none of the provisions discussed in this section were amended or deleted, the Reseller Agreement adopts all of these provisions. Moreover, the Reseller Agreement itself expressly states that DHL provides services *under the Agreement* directly to each franchisee. *See, e.g.,* Exhibit B, at § 3.03 ("If any [Unishippers] franchisee disparages DHL or the Services, or knowingly misrepresent[s] DHL or

16

the Services in any way following written notice from DHL to cease and desist, DHL may terminate *providing the Services under this Agreement for such [Unishippers] franchisee*.") (emphasis added).

> **2.      The Agreements Expressly State that Each Franchisee Has a Direct Contractual Relationship with DHL.**

The National Account Agreement does more than provide that the franchisees will receive benefits pursuant to the contract; the parties to the agreement expressly acknowledge that the agreement creates a contractual relationship between DHL and the franchisees.  "The parties acknowledge and agree that [Unishippers] and [Unishippers] Franchisee's *relationship with [DHL]* is that of an independent contractor and not an agent, servant or employee of [DHL]."  Exhibit A, at § 15.03.[6]  Thus, each franchisee had a direct contractual relationship with DHL and functioned as DHL's independent contractor pursuant to the National Account Agreement.  The parties to the National Account Agreement unambiguously agreed that the franchisees would have a direct contractual relationship with DHL; this relationship clearly gives the franchisees the right to enforce the contract against DHL.

In the Reseller Agreement, the parties expressly adopt all of the terms of the National Account Agreement that were not explicitly amended or deleted by the Reseller Agreement.  Exhibit B, at p. 3.  Sections 15.03 and 9.01 of the National Account Agreement were adopted, without change, by the parties to the Reseller Agreement, thereby reaffirming the parties' intent to establish a direct contractual relationship between the franchisees and DHL pursuant to the agreement.

---

[6]      *See also* Exhibit A, at § 9.01 ("In the use of such trademarks, tradenames, logos, and materials, [Unishippers] and [Unishippers] Franchisees shall, in each instance, conspicuously disclose that they are acting as an independent contractor and not as agent or employee for [DHL].")

3.     **DHL Agreed to Deal Directly with the Franchisees Pursuant to the Agreements.**

In addition, the National Account Agreement makes clear that DHL will deal *directly* with the franchisees in connection with billing and payment for services rendered pursuant to the Agreement.  DHL expressly and unambiguously agrees to "provide [Unishippers] and [Unishippers] Franchisees with weekly billing information necessary to bill [Unishippers] Customer Accounts by Electronic Data Interchange (EDI)," Exhibit A, at § 5.06; "to bill [Unishippers] Franchisees directly," Exhibit A, at § 12.01; and "to bill and collect from [Unishippers] Franchisees directly via EDI," Exhibit A, at § 12.02.

Not surprisingly, in light of this undisputed evidence, DHL has admitted that it had a direct billing and payment relationship with the Franchisees.  In its First Amended Counterclaims in this case, DHL stated that the agreement "provides that DHL will invoice Unishippers *and its franchisees* for shipments provided to their customers, and that Unishippers *and its franchisees* will remit payment directly to DHL, with payments due 30 days after invoice date."  *See* Rec. Doc. 73, Counterclaim at ¶ 121 (emphasis added).  And this Court has already concluded that:  "The contract language specifically and unambiguously states that *[DHL] agrees to bill and collect from USA Franchisees directly*." Rec. Doc. 186, *Unishippers Global Logistics, L.L.C. v. DHL Express (USA), Inc.*, Case No. 2:08-cv-00894-DAK-PMW, Memorandum Decision and Order, at p. 2, citing National Account Agreement §§ 12.01 and 12.02 (alteration in original).

4.     **The Contracting Parties Expressly Acknowledged that the Franchisees had Rights under the Agreements.**

The parties to the National Account Agreement went further than conferring benefits directly upon the franchisees:  the parties *expressly acknowledged* that the Franchisees

18

had rights and privileges under the National Account Agreement. Section 7.01 states: "[DHL] may notify [Unishippers] of its intent to terminate credit *privileges of a [Unishippers] Franchisee under this Agreement*." Exhibit A, at § 7.01 (emphasis added). Similarly, the contract provides that under certain circumstances, DHL "may terminate *the rights of the delinquent [Unishippers] Franchisee under this Agreement*." Exhibit A, at § 14.01(c). The parties expressly and unambiguously stated and agreed that the Franchisees had *privileges* and *rights under the Agreement*. That is the essence of a third-party beneficiary relationship.

### 5.    The Contracting Parties Expressly Acknowledged that the Franchisees had Obligations Pursuant to the Agreements.

The National Account Agreement also circumscribed the franchisees' actions and imposed upon them obligations to the contracting parties. Although a third party need not assume obligations under a contract in order to be an intended beneficiary of the contract, the fact that the franchisees had obligations pursuant to the National Account Agreement reinforces the undisputed fact that the parties intended them to be third-party beneficiaries. For example, the franchisees were obligated to sign the "Airborne Sales Code of Ethics" and "follow the guidelines for Advertising and Promotion set forth in the 'Airborne Express Advertising and Promotion Policy for Resellers.'" Exhibit A, at §§ 4.07, 4.08. In addition, the National Account Agreement limited the franchisees' ability to market to certain customers, including existing Airborne (or DHL) customers. *See* Exhibit A, at §§ 4.04, 4.05. And the franchisees were prohibited from employing DHL employees, agents, or contractors without DHL approval. Exhibit A, at § 4.09.

Moreover, the National Account Agreement stated that a franchisee could be in default under the Agreement and could breach the Agreement. *See, e.g.,* Exhibit A, at §§ 7.02, 14.01. But before DHL could terminate a franchisee's rights and privileges under the contract,

DHL was obligated to give the franchisee notice and an opportunity to cure.  *See, e.g.,* Exhibit A, at § 7.01 (Franchisee must be given opportunity to cure before losing credit privileges and being placed on Cash Basis Only); Exhibit A, at §14.01 (Franchisee must be given notice of payment delinquency, a fifteen-day period to cure the delinquency, and a final demand notice).  These sections expressly provide the Franchisees with the right to notice of an alleged breach and an opportunity to cure.

These are distinct, separate, and substantial benefits that DHL agrees to provide *directly* to the Unishippers Franchisees.  Moreover, they are benefits that are provided *separately* to each Unishippers Franchisee.  For example, with respect to the procedure for placing a franchisee on Cash Basis Only, DHL expressly "agrees that each of the above conditions for termination of credit privileges *apply separately to each [Unishippers] Franchisee.*"  Exhibit A, at § 7.02 (emphasis added).  Similarly, with respect to the procedure following payment delinquency, DHL "agrees that each of the above conditions for termination *apply separately to each [Unishippers] Franchisee.*"  Exhibit A, at § 14.01(d) (emphasis added).

It is inconceivable that the Franchisees, who are not parties to the National Account Agreement, would have *obligations* imposed upon them by the Agreement without having reciprocal *benefits* similarly granted to them.  Similarly, it is inconceivable that DHL would be able to enforce the contract against each Unishippers Franchisee by placing him or her in default or breach if the franchisee did not have the reciprocal right to enforce the contract against DHL. The contract, read as a whole, is unambiguous in expressing the parties' intent that that the Unishippers Franchisees have an enforceable interest in performance of the contract.[7]

---

[7]    The parties to the Reseller Agreement adopted each of the contract provisions discussed above, *see* Exhibit B, at p. 3, thereby reaffirming and reemphasizing the parties' intent that the franchisees were third party beneficiaries of the agreements.

C.     **Plaintiffs AEA, Gulf Coast Shippers, Kasel, and Lake Country are Third Party Beneficiaries of the National Account Agreement and the Reseller Agreement.**

It is undisputed that AEA, Gulf Coast Shippers, Kasel, and Lake Country are Unishippers Franchisees.  DHL has admitted as much.  *See* Record Doc. 72, Answer, at ¶1. Moreover, it is undisputed that they were Unishippers Franchisees at the time DHL breached the contracts.  Plaintiffs have alleged that DHL breached the contracts in 2008 and 2009.  (*See* Rec. Doc. 67, Complaint, at ¶¶ 44-91).   AEA, Gulf Coast, Kasel, and Lake Country were each Unishippers Franchisees during those years.  *See* Exhibits C, D, E, & F, Declarations from Plaintiffs.  Therefore, when performance was due under the contracts, and DHL failed to provide that performance, each of the four Phase One Trial Plaintiffs was a Unishippers Franchisee.

Because the Unishippers Franchisees were intended third party beneficiaries of the contracts, each of the four plaintiffs was a third party beneficiary of the contracts.  *See, e.g., Vencor Hospitals*, 169 F.3d at 680 n.5, citing 4 Arthur Linton Corbin, *Corbin on Contracts* § 781 (1951) (holding that the beneficiary need not be [i]identified by name, or even identifiable, at the time of contracting; "'It is enough that he be identified at the time performance is due.'"); *see also Palmer v. Davis*, 808 P.2d 128, 131 (Utah Ct. App. 1991) (when a contract purports to release from liability "agents, servants [and] employees," any person who is an employee is a third party beneficiary "explicitly and unambiguously named in the contract").  Thus, AEA, Gulf Coast, Kasel, and Lake Country are among the "class of persons" the contracting parties expressed an intent to benefit.  *See Vencor Hospitals*, 169 F.3d at 680.

## CONCLUSION

For all these reasons, this Court should grant Plaintiffs' Motion for Partial Summary Judgment and find that plaintiffs AEA, Gulf Coast Shippers, Kasel, and Lake Country

are third-party beneficiaries of the National Account Agreement and the Reseller Agreement, with rights to enforce those agreements.

Dated this 27th day of January, 2011.

Schonekas, Evans, McGoey & McEachin, L.L.C.

*/s/ Patrick S. McGoey*
Kyle Schonekas, La. Bar No. 11817
Patrick S. McGoey, La. Bar No. 24549
Maria G. Marks, La. Bar No. 23208
SCHONEKAS, EVANS, MCGOEY
& MCEACHIN, L.L.C.
650 Poydras Street, Suite 2105
New Orleans, Louisiana  70130
Telephone:  (504) 680-6050
kyle@semmlaw.com
patrick@semmlaw.com
maria@semmlaw.com

*Attorneys for all Plaintiffs*
*except Dandrea, Inc. and KMD, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 27th day of January, 2011, I caused to be served via Court's ECF electronic filing system the foregoing pleading to the following:

- **Ian Lewis Atkinson**
  ian@semmlaw.com,andi@semmlaw.com,rachel@semmlaw.com
- **Blaine J. Benard**
  blaine.benard@hro.com,tish.howell@hro.com
- **M. David Eckersley**
  mde@princeyeates.com,geniel@princeyeates.com,docket@princeyeates.com
- **George M. Haley**
  george.haley@hro.com,patricia.gray@hro.com
- **Khai LeQuang**
  klequang@orrick.com,nsweeney@orrick.com,ewestermeyer@orrick.com
- **Maria G. Marks**
  maria@semmlaw.com,andi@semmlaw.com,rachel@semmlaw.com
- **Patrick S. McGoey**
  patrick@semmlaw.com,rachel@semmlaw.com
- **William W. Oxley**
  woxley@orrick.com,sspencer@orrick.com

22

- **Christopher S. Ruhland**
  cruhland@orrick.com,nsweeney@orrick.com,ewestermeyer@orrick.com
- **Kyle D. Schonekas**
  kyle@semmlaw.com,jennifer@semmlaw.com
- **J. Andrew Sjoblom**
  andrew.sjoblom@hro.com,tish.howell@hro.com
- **Andrea V. Timpa**
  andrea@semmlaw.com,andi@semmlaw.com,rachel@semmlaw.com
- **Edwin V. Woodsome , Jr**
  ewoodsome@orrick.com,nsweeney@orrick.com,ewestermeyer@orrick.com

*/s/ Patrick S. McGoey*
Patrick McGoey

1659 kmm memo supp msj 3rd pty benef v 2.docx