M. David Eckersley (0956)
PRINCE, YEATES & GELDZAHLER
175 East 400 South, Suite 900
Salt Lake City, Utah  84111
Telephone:  801-524-1000
mde@princeyeates.com

and

Kyle Schonekas, La. Bar No. 11817
Patrick S. McGoey, La. Bar No. 24549
Maria Marks, La. Bar No. 23208
SCHONEKAS, EVANS, MCGOEY
& MCEACHIN, L.L.C.
650 Poydras Street, Suite 2105
New Orleans, Louisiana  70130
Telephone:  (504) 680-6050
kyle@semmlaw.com
patrick@semmlaw.com
maria@semmlaw.com

*Attorneys for all Plaintiffs*
*except Dandrea, Inc. and KMD, Inc.*

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | | |
|---|---|---|
| GULF COAST SHIPPERS LIMITED PARTNERSHIP, et al. | : : : | **FOURTH SUPPLEMENTAL AND AMENDED COMPLAINT** |
| Plaintiffs, | : : | Civil No. 2:09-CV-221 |
| vs. | : : | Judge Dale A. Kimball Magistrate Judge Paul M. Warner |
| DHL EXPRESS (USA), INC., an Ohio Corporation, and DPWN Holdings (USA), Inc. | : : : : | |
| Defendants. | : : | |

Plaintiffs, by and through their counsel, hereby alleges as follows for their cause of action:

## PARTIES

1.         Plaintiffs are Unishippers Franchisees from across the United States.  Plaintiffs, include the following entities:

a.         Plaintiff, **Gulf Coast Shippers Limited Partnership**, is a Louisiana limited partnership, with its principal place of business in the state of Louisiana.

b.         Plaintiff, **10YJ, L.L.C.**, is a Louisiana limited liability company, with its principal place of business in the state of Louisiana.

c.         Plaintiff, **Action Freight Systems, Inc.**, is an Arizona corporation, with its principal place of business in the state of Arizona.

d.         Plaintiff, **Advocate Logistics Group, Inc.**, is an Alabama corporation, with its principal place of business in the state of Alabama.

e.         Plaintiff, **AEA Services, Inc.**, is a Florida corporation, with its principal place of business in the state of Florida.

f.         Plaintiff, **Air Express Couriers, Inc.**, is an Illinois corporation, with its principal place of business in the state of Illinois.

g.         Plaintiff, **ALG Alabama, L.L.C.**, is an Alabama limited liability company, with its principal place of business in the state of Alabama.

h.         Plaintiff, **ALG Atlanta East, L.L.C.**, is a Georgia limited liability company, with its principal place of business in the state of Alabama.

    i.  Plaintiff, **ALG Atlanta Metro, L.L.C.**, is a Georgia limited liability company, with its principal place of business in the state of Alabama.

    j.  Plaintiff, **ALG Atlanta Southeast, Inc.**, is a Georgia corporation, with its principal place of business in the state of Alabama.

    k.  Plaintiff, **AMR Group, Inc.**, is a Pennsylvania corporation, with its principal place of business in the state of Pennsylvania.

    l.  Plaintiff, **B & B Overnight, Inc.**, is a Michigan corporation, with its principal place of business in the state of Michigan.

    m.  Plaintiff, **Bayer and Bayer, Inc.**, is an Illinois corporation, with its principal place of business in the state of Illinois.

    n.  Plaintiff, **BMJ Logistics, Inc.**, is an Illinois corporation, with its principal place of business in the state of Illinois.

    o.  Plaintiff, **Boundless Logistics, Inc.**, is a Nevada corporation, with its principal place of business in the state of Nevada.

    p.  Plaintiff, **Buehler Companies, Inc.**, is a Michigan corporation, with its principal place of business in the state of Michigan.

    q.  Plaintiff, **Carnrock, Inc.**, is an Illinois corporation, with its principal place of business in the state of Illinois.

    r.  Plaintiff, **Celcorp Carriers Inc.**, is a Texas corporation, with its principal place of business in the state of Texas.

    s.  Plaintiff, **Central Coast Logistics, Inc.**, is a California corporation, with its principal place of business in the state of California.

t.      Plaintiff, **Central Gulf Coast Shipping, Inc.**, is a Louisiana corporation, with its principal place of business in the state of Louisiana.

u.      Plaintiff, **Central Jersey Shipping Solutions, L.L.C.**, is a New Jersey limited liability company, with its principal place of business in the state of New Jersey.

v.      Plaintiff, **CKR Management, L.L.C.**, is a Utah limited liability company, with its principal place of business in the state of North Carolina.

w.      Plaintiff, **Commerce & Express, Inc.**, is a Mississippi corporation, with its principal place of business in the state of Mississippi.  Plaintiffs **Lexington Express, Inc.; Mississippi Express, Inc.; Tennessee Express, Inc.;** and **Kentucky Express, Inc.** are Mississippi corporations, with their principal place of business in the state of Mississippi. Plaintiffs Lexington Express, Inc.; Mississippi Express, Inc.; Tennessee Express, Inc.; and Kentucky Express, Inc. are wholly owned by plaintiff Commerce & Express, Inc.

x.      Plaintiff, **Complete Shipping Services, Inc.**, is a Pennsylvania corporation, with its principal place of business in the state of Pennsylvania.

y.      Plaintiff, **Cradduck Enterprises Inc.**, is an Oklahoma corporation, with its principal place of business in the state of Oklahoma.

z.      Plaintiff, **Creative Control, L.L.C.**, is a Massachusetts limited liability company, with its principal place of business in the state of Massachusetts.

aa.      Plaintiff, **Curry, Inc.**, is a Tennessee corporation, with its principal place of business in the state of Texas.

bb.      Plaintiff, **Dabar GP, L.L.C.**, is a Texas limited liability company, with its principal place of business in the state of Texas.

cc.     Plaintiff, **Dandrea, Inc.**, is a Maine corporation, with its principal place of business in the state of Florida.

dd.     Plaintiff, **Diamond Logistics, L.L.C.**, is a Minnesota limited liability company, with its principal place of business in the state of Minnesota.

ee.     Plaintiff, **DJB Investments of Naples, Inc.**, is a Florida corporation, with its principal place of business in the state of Florida.

ff.     Plaintiff, **DLS Consulting, Inc.**, is a Texas corporation, with its principal place of business in the state of Texas.

gg.     Plaintiff, **DRC of Arkansas, Inc.**, is an Arkansas corporation, with its principal place of business in the state of Arkansas.

hh.     Plaintiff, **Dupage Air Express, Inc.**, is an Illinois corporation, with its principal place of business in the state of Illinois.

ii.     Plaintiff, **Eagle's Wings, Inc.**, is a South Dakota corporation, with its principal place of business in the state of South Dakota.

jj.     Plaintiff, **El Paso Del Norte Transportation Services, Inc.**, is a Texas corporation, with its principal place of business in the state of Texas.

kk.     Plaintiff, **Essex Express, Inc.**, is a Massachusetts corporation, with its principal place of business in the state of Massachusetts.

ll.     Plaintiff, **Express One, Inc.**, is a Florida corporation, with its principal place of business in the state of Florida.

mm.     Plaintiff, **Express Shipments, Inc.**, is a New York corporation, with its principal place of business in the state of New York.

nn.     Plaintiff, **F & M Transport L.L.C.**, is a New Jersey limited liability company, with its principal place of business in the state of New Jersey.

oo.     Plaintiff, **Fellowshippers, Inc.**, is a Florida corporation, with its principal place of business in the state of Alabama.

pp.     Plaintiff, **Freight Consultants Group, Inc.**, is a Florida corporation, with its principal place of business in the state of Florida.

qq.     Plaintiff, **H.C. Ware Company, Inc.**, is a Mississippi corporation, with its principal place of business in the state of Mississippi.

rr.     Plaintiff, **Iowa Discount Shippers, Inc.**, is an Iowa corporation, with its principal place of business in the state of Iowa.

ss.     Plaintiff, **J & D Logistics, Inc.**, is an Iowa corporation, with its principal place of business in the state of Iowa.

tt.     Plaintiff, **Jasper Enterprises, Inc.**, is a Colorado corporation, with its principal place of business in the state of Colorado.

uu.     Plaintiff, **Jay Chamberlain**, is an Illinois resident who operates a sole proprietorship in the state of Illinois.

vv.     Plaintiff, **JBC Logistics, Inc.**, is an Illinois corporation, with its principal place of business in the state of Illinois.

ww.     Plaintiff, **JFS Logistics, Inc.**, is an Indiana corporation, with its principal place of business in the state of Indiana.

xx.     Plaintiff, **JMcLExpress, Inc.**, is a California corporation, with its principal place of business in the state of California.

yy.    Plaintiff, **JMK (USA) Enterprises, Inc.**, is a California corporation, with its principal place of business in the state of California.

zz.    Plaintiff, **Jubert Express, Inc.**, is a Virginia corporation,   with its principal place of business in the state of Florida.

aaa.    Plaintiff, **K & R Global, L.L.C.**, is a Utah limited liability company, with its principal place of business in the state of Utah.

bbb.    Plaintiff, **Kasel Enterprises, L.L.C.**, is a California limited liability company, with its principal place of business in the state of California.  Plaintiff **Ship4Less, L.L.C.** is a Nevada limited liability company with principal place of business in the state of Nevada; it is wholly owned by plaintiff Kasel Enterprises, L.L.C.

ccc.    Plaintiff, **KEBA Enterprises, Inc.**, is a California corporation, with its principal place of business in the state of California.

ddd.    Plaintiff, **Keyroc Logistics, Inc.**, is a California corporation, with its principal place of business in the state of California.

~~eee.    Plaintiff, **KMD, Inc.**, is a Maine corporation, with its principal place of business in the state of Florida.~~

fff.    Plaintiff, **Lake Country Logistics, L.L.C.,** is a Minnesota limited liability company with its principal place of business in the state of Minnesota.  Plaintiff **QSI Sales, L.L.C.** is a Minnesota limited liability company with its principal place of business in the state of Minnesota; it is wholly owned by plaintiff Lake Country Logistics, L.L.C.  Plaintiff **Synergistics Management, L.L.C.** is a Minnesota limited liability company with its principal

place of business in the state of Minnesota; it is wholly owned by plaintiff Lake Country Logistics, L.L.C.

ggg.    Plaintiff, **Landshire Development Corp.**, is a Utah corporation, with its principal place of business in the state of Texas

hhh.    Plaintiff, **LKO Enterprises, Inc.**, is a Massachusetts corporation, with its principal place of business in the state of Massachusetts.

iii.    Plaintiff, **Manatee Management and Marketing, Inc.**, is a Florida corporation, with its principal place of business in the state of Florida.

jjj.    Plaintiff, **MDC Express, Inc.**, is a Florida corporation, with its principal place of business in the state of Florida.

kkk.    Plaintiff, **Mercari, Inc.**, is a California corporation, with its principal place of business in the state of California.

lll.    Plaintiff, **Michael C. Little**, is a Florida resident who operates a sole proprietorship in the state of South Carolina.

mmm. Plaintiff, **Mid Atlantic Shipping Solutions, L.L.C.**, is a New Jersey limited liability company, with its principal place of business in the state of New Jersey.

nnn.    Plaintiff, **Midway Shippers, Inc.**, is an Illinois corporation, with its principal place of business in the state of Illinois.

ooo.    Plaintiff, **Mijo Logistics, L.L.C.**, is a Virginia limited liability company, with its principal place of business in the state of Virginia.

ppp.    Plaintiff, **Mitchell & Dixon, Inc.**, is an Iowa corporation, with its principal place of business in the state of Tennessee.

qqq.    Plaintiff, **Montana Global Logistics, L.L.C.**, is a Montana limited liability company, with its principal place of business in the state of Montana.

rrr.    Plaintiff, **Morning Star Associates, Inc.**, is a Georgia corporation, with its principal place of business in the state of Georgia.

sss.    Plaintiff, **MT Shipping, Inc.**, is an Arkansas corporation, with its principal place of business in the state of Arkansas.

ttt.    Plaintiff, **Mullen & Associates, Inc.**, is a Texas corporation, with its principal place of business in the state of Texas.

uuu.    Plaintiff, **OK Shippers, Inc.**, is an Oklahoma corporation, with its principal place of business in the state of Oklahoma.

vvv.    Plaintiff, **Performance Logistics Group, Inc.**, is a Colorado corporation, with its principal place of business in the state of Colorado.

www.   Plaintiff, **Philadelphia Shipping Solutions, L.L.C.**, is a New Jersey limited liability company, with its principal place of business in the state of New Jersey.

xxx.    Plaintiff, **Rabbits, Inc.**, is a Louisiana corporation, with its principal place of business in the state of Louisiana.

yyy.    Plaintiff, **RAV, Inc.**, is an Illinois corporation, with its principal place of business in the state of Illinois.

zzz.    Plaintiff, **RedOak Shipping Services, L.L.C.**, is an Oregon limited liability company, with its principal place of business in the state of Oregon.

aaaa.   Plaintiff, **RedOak Shipping Services of Oakland, L.L.C.**, is a California limited liability company, with its principal place of business in the state of California.

bbbb.  Plaintiff, **Reid Brothers, Inc.,** is a Tennessee corporation, with its principal place of business in the state of Tennessee.

cccc.   Plaintiff, **Roberts Freight Consultants, Inc.,** is a California corporation, with its principal place of business in the state of California.

dddd.   Plaintiff, **Rock Solid Logistics, Inc.,** is a Michigan corporation, with its principal place of business in the state of Mishigan.

eeee.   Plaintiff, **San Jose Shippers, Inc.,** is a California corporation, with its principal place of business in the state of California.

ffff.    Plaintiff, **Sankey & Jensen, Inc.,** is an Iowa corporation, with its principal place of business in the state of Illinois.

gggg.   Plaintiff, **Shipping Services Boise, L.L.C.,** is a Nevada limited liability company, with its principal place of business in the state of Ohio.

hhhh.   Plaintiff, **Shipping Services Indiana, L.L.C.,** is an Indiana limited liability company, with its principal place of business in the state of Ohio.

iiii.   Plaintiff, **Shipping Services Ohio, L.L.C.,** is an Ohio limited liability company, with its principal place of business in the state of Ohio.

jjjj.    Plaintiff, **Southern Express International, Inc.,** is a California corporation, with its principal place of business in the state of California.

kkkk.  Plaintiff, **Southern Shipping & Logistics, Inc.,** is an Alabama corporation, with its principal place of business in the state of Alabama.

llll.     Plaintiff, **Spectrum Development Group, Inc.,** is an Indiana corporation, with its principal place of business in the state of Michigan.

mmmm.    Plaintiff, **Spirit Transport, L.L.C.**, is a Georgia limited liability company, with its principal place of business in the state of Alabama.

nnnn.   Plaintiff, **SR Logistics, Inc.**, is an Illinois corporation, with its principal place of business in the state of Illinois.

oooo.   Plaintiff, **Stackvest Properties, Inc.**, is a New Jersey corporation, with its principal place of business in the state of New Jersey.

pppp.   Plaintiff, **Stanley E Jones**, is an Illinois resident who operates a sole proprietorship in the state of Illinois.

qqqq.   Plaintiff, **Steed & Harrington, L.L.C.**, is a Michigan limited liability company, with its principal place of business in the state of Michigan.

rrrr.    Plaintiff, **Success Enterprises GP**, is a Kansas general partnership, with its principal place of business in the state of Kansas.

ssss.   Plaintiff, **Suncoast Shippers, Inc.**, is a Florida corporation, with its principal place of business in the state of Florida.

tttt.   Plaintiff, **Syracuse Shippers, Inc.**, is a New York corporation, with its principal place of business in the state of New York.

uuuu.   Plaintiff, **The Video Co, Inc.**, is a Utah corporation, with its principal place of business in the state of Hawaii.

vvvv.  Plaintiff, **Transource, Inc.**, is a Pennsylvania corporation, with its principal place of business in the state of Pennsylvania.

wwww.  Plaintiff, **Transworld Consulting Services of Albany, L.L.C.**, is a New York limited liability company, with its principal place of business in the state of New York.

xxxx.   Plaintiff, **Transworld Consulting Services of Syracuse, L.L.C.**, is a New York limited liability company, with its principal place of business in the state of Massachusetts.

yyyy.   Plaintiff, **Transworld Consulting Services of Westchester, Inc.**, is a New York corporation, with its principal place of business in the state of New York.

zzzz.   Plaintiff, **TRB Group, Inc.**, is a Missouri corporation, with its principal place of business in the state of Missouri.

aaaaa.  Plaintiff, **Uni-Com Logistics, Inc.**, is a Pennsylvania corporation, with its principal place of business in the state of Massachusetts.

bbbbb.  Plaintiff, **United Shippers Association, Inc.**, is a Delaware corporation, with its principal place of business in the state of Florida.

ccccc.  Plaintiff, **United Shippers, Inc.**, is a New Jersey corporation, with its principal place of business in the state of New York.

ddddd.  Plaintiff, **United Shippers Northside, Inc.**, is a New Jersey corporation, with its principal place of business in the state of New York.

eeeee.  Plaintiff, **United Shippers of Suffolk, Inc.**, is a New Jersey corporation, with its principal place of business in the state of New York.

fffff.   Plaintiff, **Vermont Shipping Co., L.L.C.**, is a Vermont limited liability company, with its principal place of business in the state of Vermont.

ggggg.  Plaintiff, **W.W.S. & Associates, Inc.**, is a Texas corporation, with its principal place of business in the state of Texas.

hhhhh.  Plaintiff, **Washington Partners, Ltd.**, is a Utah limited partnership, with its principal place of business in the state of Washington.

iiiii.     Plaintiff, **Western Shipping Group, Inc.**, is a Louisiana corporation, with its principal place of business in the state of Louisiana.

jjjjj.     Plaintiff, **Wolstad Management, Inc.**, is a Washington corporation, with its principal place of business in the state of Washington.

kkkkk.  Plaintiff, **Zip Ship, Inc.**, is a Massachusetts corporation, with its principal place of business in the state of Massachusetts.

lllll.     Plaintiff, **BD Logistics, Inc.,** is an Illinois corporation, with its principal place of business in the state of Illinois.

mmmmm.       Plaintiff, **Aslan Enterprises, Inc.**, is an Ohio corporation, with its principal place of business in the state of Ohio.

nnnnn.      <u>Plaintiff, North Carolina Shipping Co., L.L.C. is a North Carolina Limited Liability Company, with its principal place of business in the state of Alabama.</u>

2.      Defendant DHL Express (USA), Inc. ("DHL"), is an Ohio corporation with its principal place of business in Florida.  DHL is authorized to and doing business in Orleans Parish, Louisiana.

3.      Defendant DPWN Holdings (USA), Inc. ("DPWN") is a Delaware Corporation, with its principal place of business in Florida.  On information or belief, DPWN is the parent or affiliate company of DHL, both of which may be owned by a German company known as Deutsche Post World Net.  Upon information and belief, DPWN has conspired to commit, committed and continues to commit torts, wrongful acts, and statutory violations within the State of Utah, that have damaged Utah residents.

## JURISDICTION AND VENUE

4.      The Court has jurisdiction of this action pursuant to 28 U.S.C. § 1332(d), as it is a mass action with monetary claims of more than 100 persons (some of which are diverse from defendants) which involve common questions of law and fact, and the matter in controversy exceeds $75,000 per plaintiff exclusive of interests and costs, and $5,000,000 collectively.

5.      This Court may also enter a declaratory judgment under 28 U.S.C. § 2201.

6.      This Court has personal jurisdiction over the defendants, who, either directly or through their agents, have transacted business within the State of Utah, contracted to supply services in the state, and/or have caused injury in the state through their tortuous conduct.  As a result, the defendants are subject to jurisdiction under Utah's long arm statute, Utah Code Annotated § 78B-3-205(1) to (3).

7.      In addition, the defendants have purposely availed themselves of the benefits of doing business in Utah, satisfying the "minimum contacts" standard for due process under the Fourteenth Amendment.

8.      Venue is proper under 28 U.S.C. § 1391(b) and (c) in that a substantial part of the events giving rise to the claims asserted herein occurred in this District, and the defendants are subject to the personal jurisdiction of this Court.  Additionally, venue is proper under 28 U.S.C. § 1407 as this is a mass action that concerns one or more common questions of fact with the case Unishippers Global Logistics v. DHL Express, District of Utah, No. 2:08-CV-00894 pending in this Court.

## FACTUAL ALLEGATIONS COMMON TO ALL PLAINTIFFS
## DHL, UNISHIPPERS, AND PLAINTIFFS

9.     DHL operated a domestic and international global delivery network for time sensitive packages.  DHL provided ground and air transportation for letters and packages.  DHL guaranteed "overnight" and "next-day" delivery.

10.     To assist with the sales of its shipping services, DHL contracted with resellers. Generally, DHL negotiated specific rates with its resellers who then resold DHL's shipping services to their own customers.

11.     Unishippers Global Logistics, L.L.C. ("Unishippers") is a Delaware Limited Liability Company with its principal place of business in Salt Lake City, Utah.  Unishippers and Plaintiffs were DHL resellers.

12.     Unishippers has been in the shipping business since 1987, and is a franchisor of its shipping and freight system.

13.     As part of its business, Unishippers negotiated and obtained discounted shipping services from DHL for its franchisees.  The rates that Unishippers obtained from DHL were based upon the weight of the package and the zone to which the package was being sent.

14.     DHL and Unishippers then made the DHL discounts and shipping services available to Unishippers' franchisees, including Plaintiffs.

15.     Plaintiffs, Unishippers franchisees from across the United States, marketed and resold DHL shipping and freight to approximately 30,000 customers nationwide.

16.     Plaintiffs' customers range from those who send a few express packages a week using DHL drop boxes to those sending numerous packages on a daily basis, with DHL pickup service from their business locations.

17.     DHL's shipping system and the discounted shipping rates obtained by Unishippers has been the central part of Plaintiffs' businesses.  Plaintiffs processed hundreds of thousands of DHL transactions per month.

18.     Plaintiffs businesses depended entirely upon DHL's ability to timely deliver packages for their customers at the rates negotiated by Unishippers for Plaintiffs.

<u>**THE NATIONAL ACCOUNT AGREEMENT**</u>

19.     On September 21, 1994, Unishippers entered into an eighteen year National Account Agreement ("National Account Agreement") with Airborne Freight Corporation ("Airborne") to receive low cost expedited shipping services for its franchisees, including Plaintiffs.

20.     Airborne agreed to be the central provider of domestic shipping services for all Unishippers franchisees, including Plaintiffs, until September 21, 2012.

21.     Under the National Account Agreement, Airborne agreed to cooperate with Unishippers' plan to expand and grow its customer base and Plaintiffs' franchise locations throughout the United States.  Airborne agreed to place drop boxes for Plaintiffs throughout the United States.

22.     Airborne agreed to deal with Unishippers and Plaintiffs in good faith.

23.     Airborne agreed to refund shipping charges to Plaintiffs when it failed to meet its service guarantees, such as overnight or "next-day" deliveries.

24.     Airborne further agreed to make no representations or warranties to third parties regarding Unishippers or Plaintiffs' businesses.

25.     Airborne also agreed to keep the names of Unishippers' and Plaintiffs' customers confidential, and to not knowingly solicit or attempt to solicit, directly or indirectly, Plaintiffs' customers.

26.     As Unishippers franchisees, Plaintiffs were intended to be and were express third-party beneficiaries of the National Account Agreement.

27.     The National Account Agreement could not be terminated without cause.

28.     As long as Unishippers and Plaintiffs honored the agreement, Airborne was obligated to provide Plaintiffs expedited domestic and international shipping services until September 21, 2012.

29.     Airborne could only terminate the National Account Agreement if Unishippers or Plaintiffs "materially breached" the Agreement and did not cure the breach after receiving two demand notices.

30.     Furthermore, if any Plaintiff elected to use a carrier other than Airborne, Airborne had the express authority to terminate the National Account Agreement for that Plaintiff.

## PLAINTIFFS' RELATIONSHIP WITH DHL

31.     In 2003, DHL merged with Airborne, and assumed all of Airborne's obligations to Plaintiffs under the National Account Agreement.  Thus, DHL was bound by all of the terms of the National Account Agreement, just as Airborne had been.

32.     Pursuant to the National Account Agreement, and subsequent amendments, Airborne and then DHL have been the central provider of shipping services to Plaintiffs and their customers.

33.     In selling DHL's services, Plaintiffs were obligated to comply with DHL's "Sales Code of Ethics For Resellers."

34.     DHL had a fiduciary or special relationship with Plaintiffs.  Based in part upon its obligations to promote the growth of Plaintiffs' businesses and refrain from soliciting Plaintiffs' customers.

35.     Plaintiffs had a relationship of trust and confidence with DHL and shared their confidential business information with DHL.

36.     On or about July 11, 2007, Unishippers and DHL amended the National Account Agreement to extend its term for five additional years, through September 21, 2017.

37.     Before and after the July 11, 2007 amendment, DHL representatives, including but not limited to Hans Hickler, reiterated DHL's long-term commitment to provide domestic and international shipping services to Plaintiffs and their customers.

38.     DHL representatives attended Unishippers franchisee meetings and told Plaintiffs of DHL's continuing commitment to them and plans to offer them better services.

39.     Plaintiffs relied upon DHL's representations that it would be Plaintiffs' long term carrier.  Plaintiffs spent a great amount of time and money incorporating DHL's shipping and billing systems into their businesses and their customers' businesses.

40.     Plaintiffs implemented a web-based, computer software system, so their customers could easily ship packages through DHL.

41.     Plaintiffs' customers entered the weight of the package and the zone to which it would be shipped online, and they then were to receive a price for the shipment, based upon Unishippers' negotiated discount prices for Plaintiffs.

42.     The web-based system also allowed for DHL to bill Plaintiffs, who in turn billed their customers.  Plaintiffs paid DHL directly for all of their customers' shipments with DHL.

43.     Plaintiffs helped to grow DHL's business over the years.  Unishippers franchisees processed approximately 740,000 DHL transactions each month.  In the peak holiday months of November and December, Unishipper franchisees processed even more DHL transactions.

### DHL AND DPWN'S PLAN FOR DHL TO ABANDON ITS U.S. DOMESTIC SERVICES

44.     On information and belief, in 2008, DPWN and DHL began to question DHL's future role in the United States domestic shipping market because of losses it was incurring.  As a result, while DPWN and DHL wanted to continue with DHL's international business, they secretly began making internal preparations to abandon DHL's U.S. domestic shipping operations.

45.     However, DHL was aware that abandoning its U.S. domestic shipping operations would violate its long-term contractual obligations to its domestic shipping partners -- including Unishippers and Plaintiffs -- who depended upon DHL's contractual commitment to provide U.S. domestic shipping services to their customers.  As a result, DPWN and DHL set out on a course to reduce DHL's liability by fraudulently inducing DHL's resellers, including Unishippers, to amend their contracts.

46.     Contrary to DHL's prior representations, in the summer of 2008, DHL announced that it was going to restructure its domestic shipping service by eliminating all pickups in certain rural service areas and handing off delivery in those areas to the United States Post Office.  DHL referred to these areas that it would not longer service as "White Spaces."

47.     DHL's unilateral decision to no longer service the "White Spaces" damaged Plaintiffs' businesses as some of Plaintiffs' customers were left without service.

48.     Throughout 2008, Unishippers questioned DHL about its continued commitment to the U.S. domestic market, and was given repeated assurances that DHL would continue to provide U.S. domestic express shipping service.

49.     Such representations were made by a number of DHL executives to Unishippers, including but not limited to Hans Hickler, CEO, Charles Brewer, Executive Vice President, and Chris Fris, Vice President of Customer Service and Services.

50.     DHL's refusal to service the "White Spaces" constituted breaches of the National Account Agreement.  Further, these actions forced Unishippers and Plaintiffs to contract with another carrier who could provide the services that DHL refused to provide.

51.     In 2008, DHL repeatedly put off Unishippers' requests for permission to engage an additional carrier, presumably because it was concerned that it would lose business if Unishippers were allowed to do so.

52.     On information and belief, no later than September 2008, DPWN and DHL had already planned to terminate DHL's domestic U.S. shipping services, but told Unishippers that DHL was merely considering possible reductions to those services.

53.     DHL's threat to reduce its services, in combination with its failure to disclose its true intentions, was central to DPWN and DHL's plan to reduce DHL's long-term contractual liability to Unishippers and Plaintiffs -- because a sudden and material reduction of DHL's domestic shipping services would be devastating to Unishippers and Plaintiffs, as they would lose their ability to adequately service their customers.

54.     As a result, the possibility that DHL's shipping services would be materially reduced gave it leverage in negotiations that DHL intended to embark upon with Unishippers. Dangling the threat of substantial reductions, DHL offered to amend the National Account Agreement to allow Unishippers to engage an additional carrier to supplement its shipping services.

### THE RESELLER AGREEMENT

55.     Because of DHL's unilateral breaches of the National Account Agreement, Unishippers was forced to find another service provider for Plaintiffs.

56.     Because of DHL's actions, Unishippers and DHL began negotiating an amendment to the National Account Agreement, which was titled "Reseller Agreement."

57.     Upon information and belief, before October 6, 2008, DHL had decided to completely withdraw its U.S. domestic shipping services and did not intend on honoring its obligations to Plaintiffs under the National Account Agreement through September 21, 2017.

58.     Almost all of the promises and representations DHL made to induce Unishippers to enter the Reseller Agreement were false, designed solely by DPWN and DHL to contractually limit DHL's damages for breach of the National Account Agreement.

59.     At no time during the negotiations of the Reseller Agreement did DHL inform Unishippers that it soon intended on ceasing to provide U.S. domestic delivery services.

60.     To the contrary, Charles Brewer and Chris Fris with DHL from August of 2008 through October 6, 2008, through phone calls and emails told Dan Lockwood with Unishippers that DHL would continue to provide domestic services to Plaintiffs.

61. Based in part upon Mr. Brewer and Mr. Fris' representations, on or about October 6, 2008, Unishippers entered into the Reseller Agreement with DHL that amended the National Account Agreement in several ways.

62. The Reseller Agreement provided that Unishippers and Plaintiffs could use a competing carrier to DHL.

63. In return for this concession, DHL demanded that it be allowed to freely solicit Plaintiffs' customers who had not done business with DHL for over 45 days.

64. DHL also demanded the right to terminate the National Account Agreement without cause.

65. After negotiating back and forth, DHL and Unishippers agreed that DHL could terminate the National Account Agreement without cause if DHL gave Unishippers written notice 180 days in advance of the termination.

66. Unishippers insisted on at least 180 days notice so that Unishippers and Plaintiffs would have sufficient time to obtain replacement shipping services from another carrier and transition their customers to the new carrier before DHL stopped servicing them.

67. Unishippers would not have agreed to the termination without cause provision if it had known that DHL intended on terminating all of its U.S. domestic shipping services by the end of 2008.

68. DHL and DPWN did not inform Unishippers of their plans to cease providing domestic shipping services to induce Unishippers to amend the National Account Agreement to add a termination without cause provision, and thus attempt to reduce the term of the National Account Agreement from nine years (2017) to 180 days.

69.     On information and belief, DHL never intended to honor the 180 day advance notice provision of the Reseller Agreement, and had already decided to terminate its U.S. domestic shipping services.  Indeed, almost all of the promises and representations DHL made to induce Unishippers to enter into the Reseller Agreement were false, and designed solely by DHL to contractually limit its damages for breach of the National Account Agreement.

### DHL CEASES TO PROVIDE DOMESTIC SERVICES

70.     On November 10, 2008, just one month after executing the Reseller Agreement, DHL publicly announced that as of December 10, 2008, it would no longer provide U.S. domestic shipping services to Unishippers, Plaintiffs or their customers.  DHL announced that if Plaintiffs' customers had regularly used its international shipping services, it would as an accommodation, provide domestic shipping services to those customers until January 30, 2009.

71.     On information and belief, DHL's actions were directed by defendant DPWN, who apparently controls the activities of DHL.  To that end, John Mullen, the President of DPWN, is also on the Board of Managers of the DHL's parent company, Deutsche Post World Net, and was the CEO of DHL prior to 2008.  Mr. Mullen publicly announced the cessation of DHL's U.S. domestic shipping services, and on information and belief, has been directing its implantation on behalf of DPWN.

72.     DHL's announcement of the elimination of domestic shipping services occurred during Plaintiffs' peak holiday shipping season.

73.     On November 10, 2008, DHL also sent Unishippers a notice of termination letter stating it was exercising its rights under the Reseller Agreement to terminate the National Account Agreement effective May 4, 2009.

74.     DHL contended that because it would continue to provide international shipping services to Plaintiffs until May 4, 2009, its discontinuance of domestic shipping services was not a termination of the National Account Agreement.

75.     DHL's announcement that it would no longer provide domestic shipping services effective December 10, 2008 constituted a breach of the National Account Agreement, as well as the Reseller Agreement, as it did not even comply with the 180 day notice provision.

76.     On November 10, 2008, DHL also wrote to Plaintiffs announcing that it was eliminating "Saturday shipping service" and would no longer guarantee its domestic delivery services, such as "overnight" or "next-day." As a result, Plaintiffs' customers would no longer have a reason to use Plaintiffs for overnight or next day delivery service since DHL would no longer guarantee it.

77.     DHL then immediately began laying off its workforce throughout the U.S.

78.     Right after sending the November 10, 2008 letter notifying Unishippers of its intent to terminate domestic shipping service in thirty (30) days, DHL pulled down its DHL drop boxes across the United States, suspended its service guarantees, and restricted its pickups. Moreover, when Plaintiffs' customers called DHL's 1-800 number, they were told that DHL no longer provided domestic shipping services.

79.     On information and belief, these actions were directed by DPWN through its officer and/or director, John Mullen.

80.     In taking and/or directing these actions, DPWN and DHL made a concerted effort to drive away Plaintiffs' domestic shipping service customers long before the December 10,

2008 date, upon which DHL originally stated that it would cease providing domestic shipping services to Plaintiffs.

81.     Once DHL eliminated its guarantees and many of its workers, DHL routinely failed to timely deliver Plaintiffs' customers' packages.

82.     Despite eliminating its guarantees and failing to timely deliver packages, DHL continued to bill Plaintiffs the rates associated with guaranteed deliveries.

83.     DHL failed to provide to Plaintiffs the domestic and international shipping services as were required under the National Account Agreement.

84.     DHL also damaged Plaintiffs' business by making public announcements that DHL, and in turn Plaintiffs, could not guarantee deliveries and would not be delivering packages over the peak holiday shipping season.

85.     Upon information and belief, DPWN and DHL engaged in such actions to force Plaintiffs' customers to use other carriers for domestic services, even though DHL was contractual obligated to provide those services to Plaintiffs.

86.     As a result of DHL's unilateral and wrongful breach of the National Account Agreement, Plaintiffs do not have sufficient time to obtain replacement shipping services from another carrier.

87.     Plaintiffs lost up to fifty percent of their customer base as a direct result of DHL's wrongful actions.

88.     Plaintiffs also lost significant holiday shipping business due to DPWN and DHL's wrongful actions.

89.     Due to DPWN and DHL's wrongful actions, Plaintiffs have also lost customers to other carriers which they can not recapture.

90.     Once Plaintiffs found replacement shipping services for its remaining customers, it was at a substantial increase in cost over the amounts charged by DHL under the National Account Agreement, which will cause a significant loss in profits to Plaintiffs from at least 2008 through September 21, 2017.

91.     Additionally, DHL has been using Plaintiffs' customer contact information to directly solicit Plaintiffs' customers to use DHL for their international shipping business.  Upon information and belief, DHL has contacted Plaintiffs' customers and offered them the discounted international shipping rates that DHL previously had offered only to Plaintiffs and agreed to keep confidential.  This has further damaged Plaintiffs.

## DHL'S BILLING PRACTICES

92.     Upon information and belief, DHL has also intentionally or negligently falsified the weights of packages sent by Plaintiffs' customers, thus overcharging Plaintiffs for the shipping services.

93.     For example, if Plaintiffs mailed an eight ounce letter, for which Plaintiffs should have been charged one rate, DHL would sometimes re-classify the package as a one-pound package and charge Petitioner a higher price, even if the package was not a one pound package.

94.     Upon information and belief, DHL improperly up-charged Plaintiffs on perhaps hundreds of thousands of shipments, thereby damaging Plaintiffs on each shipment.

94(a).  Under Section 2.05 of the National Account Agreement, DHL guaranteed to Plaintiffs that "no other reseller will have equal or lower rates for comparable volume of business."

94(b).  Under Amendment 10 to the National Account Agreement, DHL agreed to give Plaintiffs a 20% discount on all assessorial charges.

94(c).  Upon information and belief, from 2003 through 2007, DHL provided resellers Express One, United Shipping Solutions Logistics and their franchisees lower shipping rates then DHL charged Plaintiffs, even though Express One and United Shipping Solutions Logistics and their franchisees, had less volume of business than Unishippers and Plaintiffs.

94(d).  Upon information and belief, from 2004 through 2008, DHL provided Costco lower rates for pre-paid shipping services than DHL provided to Unishippers and Plaintiffs, even though Costco had less volume of business than Unishippers and Plaintiffs.

94(e).  Upon information and belief, from 2003 through 2008, DHL did not give Plaintiffs the 20% discount on assessorial charges as required by Amendment 10 to the National Account Agreement.

95.    Additionally, since DHL has cut its workforce, it has sent Plaintiffs inaccurate bills that do not reflect adjustments, credits, or the proper charges.

96.    Plaintiffs have complained to DHL about the inaccurate bills, but DHL has not corrected the problems.

97.    DHL has sent Plaintiffs default notices using materially inaccurate information, and failed or refused to review or correct such incorrect information before it issued the default notices.

## DHL'S REFUSAL TO HONOR THE SHIP READY GUARANTEE

98.     Prior to the announcement of DHL's withdrawal from the U.S. shipping market, DHL marketed "Ship Ready Express" products to its customers, including Plaintiffs.

99.     Ship Ready Express products are prepaid envelopes and packages which can be shipped for a fixed price regardless of the weight of the contents without the necessity of completing a weigh bill.  The shipper simply completed the address label and dropped the Ship Ready Express package at any DHL drop box or service center.

100.    DHL guaranteed to Ship Ready Express purchasers, including Plaintiffs that Ship Read Express packages would be delivered by the next business day.  DHL further guaranteed that unused Ship Ready Express products could be returned at any time for a full refund.

101.    Prior to the filing of this litigation, Plaintiffs purchased hundreds of thousands of dollars in Ship Ready Express envelopes and packages from DHL.

102.    After DHL withdrew from the U.S. shipping market, closed its service centers, removed its drop boxes and ceased making guaranteed deliveries, the Ship Ready Express envelopes and packages purchased by Plaintiffs from DHL became worthless.

103.    Petitioners have attempted to return unused Ship Ready Express envelopes and packages to DHL in accordance with DHL's full refund guarantee.

104.    For a brief time, DHL honored the refund requests.  Since this litigation has commenced, however, DHL has advised Plaintiffs that it will not issue further refunds for Ship Ready Express purchases to Plaintiffs as a result of the litigation pending between Petitioners and DHL.

## COUNT I:  RESCISSION OF THE RESELLER AGREEMENT

105.    Plaintiffs adopt, reallege and incorporate the preceding allegations of the petition as if copied herein in extenso.

106.    DHL had a fiduciary or special relationship of trust and confidence with its resellers, including Unishippers and Plaintiffs.

107.    DHL had a duty to promote Plaintiffs' businesses and help them grow. Accordingly, DHL had a duty to Plaintiffs to disclose its plan to withdraw from the U.S. Market.

108.    DHL misrepresented and/or suppressed the truth regarding its intentions to discontinue domestic shipping services at the time the Reseller Agreement was negotiated and amended in October, 2008.

109.    On or about October 6, 2008, Unishippers entered the Reseller Agreement with DHL, which modified the terms of the parties' National Account Agreement to give DHL the right to terminate the agreement without cause, whereas no such right existed before.

110.    A key and essential covenant of the Reseller Agreement was DHL's promise to give Unishippers at least one hundred and eighty (180) days advance notice before terminating the parties' contract, and DHL's corresponding obligation to provide U.S. domestic service to Unishippers, Plaintiffs, and Plaintiffs' customers under the National Account Agreement.

111.    DHL's breach of the advance notice provision of the Reseller Agreement, which occurred within a month after it was signed, constituted a breach of a dependent covenant, which was an essential part of the Reseller Agreement, and without which Unishippers would not have agreed to modify the National Account Agreement on the terms set forth in the Reseller Agreement.

112.    On information and belief, at the time that DHL suggested that Unishippers amend the National Account Agreement to allow it to be terminated without cause, DHL already secretly planned to discontinue its U.S. domestic shipping service.

113.    DHL's concealed objective was to secure an amendment to the National Account Agreement that would limit its liability and its performance obligations thereunder, including but not limited to doing away with the remaining nine (9) year term, which would have continued through September 20, 2017.

114.    DHL knew that it would soon be discontinuing its domestic shipping services at the time it executed the Reseller Agreement, but Charles Brewer and Chris Fris intentionally withheld this vital information from Unishippers and Plaintiffs.  Unishippers and Plaintiffs could not have discovered this information through its own diligence.  Moreover, Mr. Brewer and Mr. Fris stated to Dan Lockwood, prior to October 6, 2008 that DHL would continue to provide U.S. domestic services to Plaintiffs.

115.    DHL acted with the intention to obtain an unjust advantage over Plaintiffs or to cause a loss or inconvenience to Plaintiffs (i.e. to get Unishippers to agree to a termination without cause provision for the National Account Agreement so it could reduce its liability to Plaintiffs).

116.    DHL's concealed objective was to secure an amendment to the National Account Agreement that would limit its liability and performance obligations thereunder.

117.    Although DHL understood and agreed to the advance notice termination provisions set forth in the Reseller Agreement, DHL secretly intended to violate said termination provisions when it entered into that agreement.

118.   DHL's secret plan, concealed objective and secret intention described above constituted concealment by DHL of material facts, which concealments were intended by DHL to deceive Unishippers, and thereby induce Unishippers to enter into the Reseller Agreement.

119.   Further, DHL's false representations that it would provide the required advance notice and otherwise comply with the terms of the Reseller Agreement were material and were intended by DHL to deceive and induce Unishippers to enter into that agreement, and thereby give up one or more of its material rights under the National Account Agreement, including but not limited to its remaining term through September 20, 2017.

120.   Unishippers was in fact deceived by DHL's concealments of material facts, and material representations, and thereby induced to enter into the Reseller Agreement.

121.   Unishippers acted reasonably and justifiably in entering into the Reseller Agreement on the basis of DHL's representations concealment of material facts.

122.   DHL's actions were taken intentionally, willfully, wantonly, and with malice.

123.   Accordingly, Plaintiffs are entitled to rescission of the Reseller Agreement and to pursue its remedies under the National Account Agreement.

## COUNT II:  DECLARATORY JUDGMENT
## AGAINST DHL

124.   Plaintiffs adopt, reallege, and incorporate the preceding allegations of this Petition as if copied herein in extenso.

125.   There is an actual and substantial controversy as to the National Account Agreement and whether DHL's discontinuance of domestic shipping services constituted a wrongful termination and breach of the National Account Agreement.

126.   This controversy can and should be resolved by judicial declaration, by a finding that:

a.   DHL's cessation of providing domestic shipping services constituted a breach of the National Account Agreement;

b.   If the Reseller Agreement is not rescinded, DHL was required to give 180 days prior written notice to Unishippers and Plaintiffs before discontinuing its domestic shipping services;

c.   DHL did not give Unishippers or Plaintiffs 180 days written notice prior to terminating its domestic shipping services;

d.   DHL's failure to give the required notice constituted a wrongful termination and breach of the National Account Agreement and/or Reseller Agreement;

e.   DHL's material breaches of the National Account Agreement discharged Plaintiffs of all remaining obligations to DHL, including payment of inaccurate invoices.

f.   DHL breached Section 2.05 of the National Account Agreement by charging Plaintiffs higher shipping rates than it charged to Express One, United Shipping Solutions Logistics, their franchisees, and Costco.

g.   DHL breached Amendment 10 to the National Account Agreement by not giving Plaintiffs a 20% discount on all assessorial charges.

## COUNTS III AND IV:  BREACH OF CONTRACT AND BAD FAITH BREACH OF CONTRACT AGAINST DHL

127.   Plaintiffs adopt, reallege, and incorporate the preceding allegations of this Petition as if copied herein in extenso.

128.   The National Account Agreement entered into by Unishippers and DHL is a valid and binding contract.

129.   Plaintiffs are third party beneficiaries of the National Account Agreement, and as such, are entitled to enforce the contract against DHL.

130.   DHL breached the National Account Agreement in the following non-exclusive ways:

(1)   Withdrawing shipping services to "White Spaces;"

(2)   Announcing that it was discontinuing its U.S. domestic shipping services and that Plaintiffs could not provide their customers with DHL services during the peak holiday shipping season;

(3)   Failing to provide domestic and international shipping services to Plaintiffs through September 21, 2017;

(4)   Terminating the National Account Agreement without cause;

(5)   Failing to provide at least 180 days notice prior to terminating the National Account Agreement;

(6)   Removing all guarantees to its domestic shipping services;

(7)   Pulling drop boxes across the United States;

(8)   Soliciting Plaintiffs' customers; and

(9)   Overcharging Plaintiffs for shipments.

(10)   Giving Express One, United Shipping Solutions Logistics, their franchisees, and Costco lower rates than Plaintiffs for shipping services and not giving Plaintiffs a 20% discount on accessorial fees.

131.   DHL's breaches of the National Account Agreement caused Plaintiffs to suffer substantial damage including, but not limited to, loss of customers, goodwill, business opportunities, and profits.

132.   Moreover, in each and every instance alleged above, DHL breached the National Account Agreement intentionally and in bad faith and is therefore liable for all damages, foreseeable or not, that are a direct consequence of its actions.

133.   Plaintiffs are entitled to recover damages, as well as attorneys fees pursuant to the National Account Agreement.

**COUNT V: UNFAIR TRADE PRACTICES
AGAINST DPWN**

134.   Plaintiffs adopt, reallege, and incorporate the preceding allegations of this Petition as if copied herein in extenso.

135.   Plaintiffs were consumers of DHL's shipping services.  Since DHL breached the National Account Agreement in the summer of 2008, Plaintiffs have had to provide shipping services to its customers through UPS.  Accordingly, Plaintiffs have been and presently are competitors of DHL in the international shipping business.

136.   DHL and DPWN have engaged in unfair methods of competition and unfair and deceptive acts and practices in the conduct of DHL's business as described herein.  DPWN and DHL performed unethical conduct by concealing their plans to cease providing domestic services in an attempt to force Unishippers and Plaintiffs to agree to amend the National Account Agreement to add a termination without cause provision.

137.    DHL and DPWN committed the unethical conduct so DHL could limit its liability to Plaintiffs, cancel the Reseller Agreement, and then misappropriate Plaintiffs' international shipping business for themselves.

138.    DHL and DPWN conspired with one another to commit the intentional and willful acts i.e. to commit unfair trade practices and intentionally wrongful acts, to the detriment of Plaintiffs.

139.    Plaintiffs have been damaged in an amount to be proven at trial.

140.    Because the defendants conspired to commit the intentional and wrongful acts and harm Plaintiffs, DWPN is solidarily liable unto Plaintiffs for the extent of their damages, including attorneys' fees.

**COUNT VI &VII  INTENTIONAL INTERFERENCE WITH
CONTRACTS AND/OR PROSPECTIVE ECONOMIC/CONTRACTUAL
RELATIONS AGAINST DWPN**

141.    Plaintiffs adopt, reallege, and incorporate the preceding allegations of this Petition as if copied herein in extenso.

142.    Plaintiffs had contracts and business relationships with DHL and with their customers to ship packages domestically and internationally through the use of DHL.

143.    DPWN had the knowledge that Plaintiffs had contracts with DHL and their customers to ship packages through DHL.

144.    DPWN intended to interfere with Plaintiffs' relationships with DHL and their customers.

145.    DPWN intentionally and improperly interfered with the performance of these contracts without justification.

146.    By causing DHL to wrongfully terminate the National Account Agreement and conceal the implementation of their plan to terminate domestic shipping services, DPWN made the performance of Plaintiffs' agreements with DHL and their customers impossible, if not more expensive and burdensome.

147.    DPWN intentionally and improperly interfered with Plaintiffs' performances of their contracts with DHL and their customers.  DPWN is liable to Plaintiffs for all damages caused by their acts as will be proven at trial.

148.    DPWN's intentionally and improperly interfered with DHL's performance of its contracts with Plaintiffs.

149.    DWPN's actions of announcing that DHL was going to cease providing U.S. domestic shipping services, removing DHL's delivery guarantees, pulling DHL's drop boxes, and soliciting Plaintiffs' international shipping business constituted interference with Plaintiffs' contracts with their customers.

150.    DPWN acted with the purpose of harming Plaintiffs, or in the alternative, used dishonest, unfair and improper means to interfere with Plaintiffs' contractual relations with their customers.  DPWN had no justification for its intentional interference with Plaintiffs' contracts.

151.    DPWN injured Plaintiffs relationships with their customers and is liable for the damages as will be proven at trial.

## COUNT IX:  BREACH OF READY SHIP EXPRESS CONTRACT AGAINST DHL

152.    Plaintiffs adopt, reallege, and incorporate the preceding allegations of this Petition as if copied herein in extenso.

153.    When DHL sold Ready Ship Express products to Petitioners, it entered a binding contract with Plaintiffs.

154.    Specifically, DHL guaranteed that Plaintiffs would be given a full refund at any time for any unused Ready Ship Express products purchased by Plaintiffs.

155.    Plaintiffs have complied with all of its obligations under the Ready Ship Express contract, yet DHL has refused to honor its guarantee.

156.    By refusing to honor its full refund guarantee and to issue refunds to Plaintiffs for unused Ready Ship Express products, DHL has breached the parties' contract.

157.    Moreover, in each and every instance alleged above, DHL breached the Ready Ship Express contract intentionally and in bad faith and is therefore liable for all damages, foreseeable or not, that are a direct consequence of its actions.

158.    Plaintiffs, therefore, are entitled to recover damages, as well as attorneys fees, as a result of DHL's breach of contract.

## **JURY DEMAND**

159.    Plaintiffs demand a trial by jury on all claims and issues raised in this matter which may be tried before a jury**.**

**WHEREFORE,** Plaintiffs pray that judgment be entered in their favor and against defendant, DHL Express (USA), Inc. declaring that the Reseller Agreement is null and void, that DHL Express (USA), Inc. is in breach of its contracts with Unishippers Global Logistics, L.L.C., that Plaintiffs are third party beneficiaries of the contracts, and that DHL Express (USA) Inc. and

DPWN Holdings (USA), Inc. are is liable to Plaintiffs for all damages caused by their breaches and wrongful conduct, including attorneys fees and costs, and for any other equitable relief the court may deem proper.

Schonekas, Evans, McGoey & McEachin, L.L.C.

By: */s/ Patrick S. McGoey*

     Kyle Schonekas, La. Bar No. 11817
     Patrick S. McGoey, La. Bar No. 24549
     Maria Marks, La. Bar No. 23208
     SCHONEKAS, EVANS, MCGOEY
     & MCEACHIN, L.L.C.
     650 Poydras Street, Suite 2105
     New Orleans, Louisiana  70130
     Telephone:  (504) 680-6050
     kyle@semmlaw.com
     patrick@semmlaw.com
     maria@semmlaw.com

     *Attorneys for all plaintiffs except Dandrea, Inc.*
     *and KMD, Inc.*

**CERTIFICATE OF SERVICE**

   I hereby certify that on the 25th day of August, 2011, I caused to be served via Court's ECF electronic filing system the foregoing Fourth Supplemental and Amended Complaint, to the following:

- **Ian Lewis Atkinson**
  ian@semmlaw.com,andi@semmlaw.com,rachel@semmlaw.com
- **Blaine J. Benard**
  bjbenard@hollandhart.com,slclitdocket@hollandhart.com,phowell@hollandhart.com,intaketeam@hollandhart.com
- **Dennis J. Conroy**
  djc@silconlaw.com,js@silconlaw.com
- **M. David Eckersley**
  mde@princeyeates.com,geniel@princeyeates.com,docket@princeyeates.com
- **Lewis M. Francis**
  lfrancis@joneswaldo.com,ecf@joneswaldo.com,krichardson@joneswaldo.com

- **George M. Haley**
  gmhaley@hollandhart.com,smsansom@hollandhart.com,slclitdocket@hollandhart.com,intaketeam@hollandhart.com,plgray@hollandhart.com
- **Maria G. Marks**
  maria@semmlaw.com,andi@semmlaw.com,rachel@semmlaw.com
- **Eric G. Maxfield**
  egmaxfield@hollandhart.com,slclitdocket@hollandhart.com,ljcuskelly@hollandhart.com,intaketeam@hollandhart.com
- **Patrick S. McGoey**
  patrick@semmlaw.com,rachel@semmlaw.com
- **William W. Oxley**
  william.oxley@dechert.com,Magdalena.St.Germain@dechert.com,patty.ruiz@dechert.com,Susan.Spencer@dechert.com,eugene.westermeyer@dechert.com
- **Amy Rudd**
  amy.rudd@dechert.com
- **Christopher S. Ruhland**
  christopher.ruhland@dechert.com,Magdalena.St.Germain@dechert.com,patty.ruiz@dechert.com,Susan.Spencer@dechert.com
- **Ellie T. Schilling**
  ellie@semmlaw.com,andi@semmlaw.com,rachel@semmlaw.com
- **Kyle D. Schonekas**
  kyle@semmlaw.com,jennifer@semmlaw.com
- **Spencer C. Siebers**
  scs@silconlaw.com,tj@silconlaw.com
- **J. Andrew Sjoblom**
  jasjoblom@hollandhart.com,slclitdocket@hollandhart.com,phowell@hollandhart.com,intaketeam@hollandhart.com
- **Andrea V. Timpa**
  andrea@semmlaw.com,andi@semmlaw.com,rachel@semmlaw.com
- **Eliot J. Walker**
  eliot.walker@dechert.com
- **Jessica P. Wilde**
  jwilde@joneswaldo.com,bparry@joneswaldo.com
- **Andrew S. Wong**
  andrew.wong@dechert.com,patty.ruiz@dechert.com,susan.spencer@dechert.com,magdalena.st.germain@dechert.com
- **Edwin V. Woodsome , Jr**
  ed.woodsome@dechert.com,Magdalena.St.Germain@dechert.com,patty.ruiz@dechert.com,Susan.Spencer@dechert.com

*/s/ Patrick S. McGoey*
Patrick McGoey