IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| GULF COAST SHIPPERS LIMITED PARTNERSHIP, et al., <br><br>         Plaintiffs, <br><br>    v. <br><br> DHL EXPRESS (USA), INC., an Ohio corporation, <br><br>         Defendant. | **MEMORANDUM DECISION & ORDER** <br><br><br> Case No. 2:09-CV-00221 <br><br> Judge Robert J. Shelby |

This case arises out of a commercial dispute between companies engaged in the business of sending packages. Defendant DHL Express (USA), Inc. provided express shipping services. At one time, Plaintiffs Gulf Coast Shippers Limited Partnership, Kasel Enterprises, LLC, Lake County Logistics, and AEA Services, Inc. (collectively, Plaintiffs) relied on DHL to send packages throughout the United States. Changes in the marketplace and DHL's shipping services triggered a dispute between the parties that led to this lawsuit.

Three motions for partial summary judgment are before the court. Plaintiffs seek summary judgment on four discrete issues allegedly resolved in previous litigation[1] and summary judgment on three of DHL's counterclaims.[2] DHL moves for summary judgment on three of Plaintiffs' contract claims.[3] For the reasons set forth below, the court GRANTS IN PART and DENIES IN PART each of the motions for partial summary judgment.

---

[1] Dkt. No. 400.

[2] Dkt. No. 399.

[3] Dkt. No. 402.

1

## BACKGROUND

To provide context for the motions, the court will first discuss the shipping industry, the underlying agreements between the parties, the events that gave rise to this case, and the parties' prior litigation.

### A.      The National Account Agreement

Plaintiffs are current and former franchisees of Unishippers Global Logistics, LLC.  In the shipping industry, companies that do not ship packages themselves but rather buy shipping services at wholesale rates and then sell those services to customers who want to ship packages are known as resellers.  Unishippers is one such reseller.  It obtains wholesale rates from more recognizable shipping companies and then offers these rates to franchisees under individual agreements.

In 1994, the predecessors to Unishippers and DHL entered into a contract, the National Account Agreement (Agreement).[4]  The Agreement provided that Unishippers would promote DHL's services in exchange for specific rates that would be subject to periodic adjustment.[5]  The Agreement required DHL to "provide to [Unishippers,] [Unishippers] Franchisees and [Unishippers] Accounts Transportation Services subject to the conditions of [the] Agreement."[6] "Transportation Services" were defined as "door-to-door expedited pickup and delivery of time sensitive documents and packages as described in the . . . Service Guide and this Agreement."[7] Under the subheading describing DHL's obligations, the Agreement stated: "[DHL] will provide

---

[4] Dkt. No. 401-1.  Unishippers Association, Inc. (USA) and Airborne Freight Corporation signed the National Account Agreement.  In 2003, DHL acquired Airborne Freight Corporation and assumed its contractual obligations.  Similarly, USA became Unishippers Global Logistics, LLC in 2007.

[5] *See* Dkt. No. 401-1, §§ 4.01, 4.04.

[6] *Id.* § 3.01.

[7] *Id.* § 1.04.

Transportation Services in accordance with, and to the full extent of, this Agreement and the parameters of the general conditions of its Service Guide in effect at the time[.]  Except as otherwise provided, this Agreement will apply to all shipments tendered to [DHL] by [Unishippers], [Unishippers] Franchisees, and [Unishippers] Customers."[8]

Several provisions in the Agreement expressly refer to franchisees.  For example, the Agreement provided that neither Unishippers nor its franchisees would "knowingly market air express services to Existing [DHL] Customers, unless authorized by [DHL]."[9]  Similarly, the Agreement restricted franchisees' ability to solicit sales, required franchisees to forward certain requests to DHL, mandated franchisees follow advertising guidelines, and prohibited franchisees from employing or providing direct compensation to DHL's employees without approval.[10]

Sections 2.01 to 2.05 describe the general guidelines for shipping rates.  Specifically, Section 2.05 stated that DHL "guarantee[d] that no other reseller will have equal or lower rates for comparable volume of business."[11]  Section 2.04 provided that the parties "agree that certain provisions pertaining to rates may be mutually decided upon as indicated by Attachment B, attached hereto and made a party of this Agreement, and are subject to annual negotiation."[12]  The remaining sections set out guidelines for the duration of rates and issues relating to rate changes.[13]  Section 2.05 does not expressly refer to Unishippers, Plaintiffs, or any of the franchisees.

---

[8] *Id.* § 5.03.

[9] *Id.* § 4.04 ("The parties agree the intent of the Customer Discount Program under this Agreement is to authorize [Unishippers] and [franchisees] to engage in marketing activities to attract new customers.").

[10] *Id.* §§ 4.05, 4.06, 4.08, 4.09.

[11] *Id.* § 2.05.

[12] *Id.* § 2.04.

[13] *Id.* §§ 2.01, 2.02.

Section 5.05 provided that DHL "agrees to deal with [Unishippers] and [Unishippers] Franchisees in good faith in all aspects of this Agreement and to provide [Unishippers] shipping rates consistent with market trends and conditions."[14]

Finally, the Agreement contained provisions relating to billing and shipping charges.[15]

**B.      Amendments**

Consistent with the Agreement, DHL and Unishippers renegotiated shipping rates on several occasions and amended the Agreement to reflect the changes.[16]

In 2001, DHL and Unishippers executed Amendment 9.  Amendment 9 revised shipping rates and made the new rates effective for one year.  DHL and Unishippers also adopted a "Zip Pricing Program," which was "optional for the Franchisees."[17]  Amendment 9 provided that, except as amended, "all other terms and conditions of the Agreement shall remain in full force and effect."[18]

In 2002, DHL and Unishippers executed Amendment 10, which adopted a new price structure based on growth and UPS rates.[19]  The parties again agreed that "all other terms and conditions of the Agreement shall remain in full force and effect, including but not limited to Section 2.05 of the Agreement."  Amendment 10 further stated: "Assessorial fees shall be determined in advance of any increase by written agreement of the parties hereto.  In the absence

---

[14] *Id.* § 5.05.

[15] *See, e.g., id.* §§ 5.06, 12.01, 12.02.

[16] *Id.* at Amendment Nos. 1-9.

[17] *Id.* at Amendment No. 9.

[18] *Id.*

[19] *Id.* at Amendment No. 10.

of any agreement, the assessorial fees shall be twenty (20%) below any customary [DHL] rates."[20]  The assessorial fee provision did not reference Unishippers or its franchisees.

### C.    White Space Restructuring

In May 2008, DHL announced that it would reduce domestic shipping services in areas with low population density.  The parties refer to this initiative as the White Space Restructuring.  The White Space Restructuring affected 4,000 rural ZIP codes.  DHL communicated this plan to Unishippers in advance of the restructuring.  Around that same time, Unishippers contacted FedEx and UPS to inquire about alternate carrier service for its franchisees.  There is evidence that DHL's White Space Restructuring affected Unishippers' franchisees in different ways.[21]

### D.    The Reseller Agreement

On October 6, 2008, DHL and Unishippers entered into the Reseller Agreement.[22]  In the Reseller Agreement, DHL and Unishippers deleted Sections 8.02 and 8.03 from the Agreement.  This change permitted Franchisees to use companies other than DHL for shipping services.[23]  In return, DHL obtained the right to terminate the Agreement, without cause, by giving 180 days advance written notice to Unishippers.[24]  The Reseller Agreement also gave Unishippers the right to terminate the parties' contract, although the notice period was substantially shorter.[25]

---

[20] *Id.* ¶ 11.

[21] Dkt. No. 413-2, at 131-35; Dkt. No. 413-3, at 215-16.

[22] Dkt. No. 401-2.

[23] *Id.*

[24] *Id.* §§ 6.02, 6.03.

[25] *Id.*

**E.      Cessation of Domestic Services and Termination**

After signing the Reseller Agreement with DHL, Unishippers entered a separate reseller contract with UPS on October 22, 2008.  According to Unishippers, UPS agreed to provide rates to Unishippers franchisees that were much higher than DHL's guaranteed rate.

A few weeks later, on November 10, 2008, DHL announced that it would cease providing guaranteed services within a week of the notice, and it would stop offering domestic services to a portion of customers beginning December 10, 2008.[26]  DHL also stated it would stop providing domestic services on January 30, 2009.[27]  DHL notified Unishippers that it was exercising its right to terminate the Agreement pursuant to § 6.03 of the Reseller Agreement.  According to DHL, Unishippers received notice on November 11, 2008 that DHL was terminating the Agreement and the Reseller Agreement, effective May 4, 2009 (later amended to May 10, 2009).[28]

DHL maintains it continued to provide shipping services to Unishippers and its franchisees after sending the termination notice on November 10, 2008.  Interrogatory responses suggest that Plaintiffs last used DHL's shipping services in early 2009, but Plaintiffs' responses do not make clear whether these services were domestic or international.[29]

**F.      Demand Letters**

In late 2008 and early 2009, DHL sent Plaintiffs Pre-Default and Final Demand Notices. DHL claimed that Plaintiffs owed certain amounts for unpaid shipments.[30]  For example, Gulf

---

[26] Dkt. No. 413-6.

[27] *Id.*

[28] Dkt. No. 412, at v.

[29] Dkt. No. 413-7.

[30] *See, e.g.*, Dkt. Nos. 399-3, 399-4, 399-5.

Coast received letters in December 2008 and November 2009, in which DHL claimed that a Baton Rouge office owed $40,483.77 and a Phoenix office owed $64,127.14.[31]  Plaintiff AEA received letters in September 2008 and January 2009, in which DHL claimed it owed $75,319.41 and $132,102.59 for past due invoices.[32]  Kasel and Lake received similar notices.[33]

In turn, DHL received correspondence disputing the amounts claimed in the Pre-Default and Final Demand Notices.  As early as October 2008, Lake disputed the DHL invoices.  In November 2008, Unishippers sent a letter objecting to the notices and alleging DHL's calculation of the amount owed was incorrect.[34]  Gulf Coast emailed DHL an objection to the billing invoices in January 2009.[35]  That same month, AEA notified DHL of its concern over the invoice amounts,[36] and Kasel questioned the validity of the billing and the invoice amounts.[37]  Indeed, Unishippers franchisees filed suit in Louisiana state court in January 2009 contesting DHL's billing practices.[38]

**G.     Litigation History**

1.     The *Unishippers* Litigation

In November 2008, shortly after receiving notice of cessation of domestic services, Unishippers sued DHL in this District (the *Unishippers* Litigation).[39]  Unishippers alleged that

---

[31] Dkt. No. 399-2.

[32] Dkt. No. 399-3.

[33] *See* Dkt. Nos. 399-4, 399-5.

[34] Dkt. No. 399-2, at Ex. 2C.

[35] *Id.* at Ex. 2D.

[36] *Id.* at Ex. 3C.

[37] *Id.* at Ex. 4C.

[38] *Id.* at Ex. 2E.

[39] *Unishippers Global Logistics, LLC v. DHL Express (USA), Inc.*, No. 2:08-cv-00894 (D. Utah Nov. 18, 2008).

DHL breached its contract with Unishippers by failing to provide domestic shipping services and by overcharging for its services.[40]

The Honorable Dale A. Kimball presided over the *Unishippers* Litigation.  In May 2011, Judge Kimball resolved cross-motions for partial summary judgment on several claims and defenses relating to the Agreement.[41]  Judge Kimball held that genuine issues of material fact precluded summary judgment on overage and White Space claims.  Judge Kimball granted partial summary judgment to Unishippers insofar as "DHL breached the parties' contract by failing to provide 180 days advance notice of its cessation of U.S. domestic shipping services."[42]

In July 2011, Judge Kimball presided over a jury trial on the issue of damages and to adjudicate the remaining contract claims.[43]  The parties dispute the nature of the testimony presented on damages.  According to DHL, Unishippers "presented conflicting testimony regarding overcharge damages at . . . trial that would not support a determination that $7 million of the jury's damages award was for past overcharges."  Unishippers' expert, Rick Hoffman, calculated Unishippers had suffered approximately $30 million in lost profit damages.  This calculation included damages for "past overcharges."[44]  During cross-examination, Mr. Hoffman testified that if DHL did not overcharge Unishippers, his damages calculation should be reduced to $23 million.

Giving effect to his earlier ruling on the parties' cross-motions for partial summary judgment, Judge Kimball instructed the jury that DHL breached the contract by failing to provide

---

[40] Dkt. No. 403-8.

[41] Dkt. No. 401-6.

[42] *Id.* at 7 ("In other words, contrary to DHL's position, the court finds that ceasing domestic shipping services constituted a 'termination' under the Agreement.").

[43] Dkt. No. 400, at xiii.

[44] Dkt. No. 401-10, at 1060-62.

180-day advance notice to Unishippers before terminating the Agreement, and asked the jury to determine damages.  The jury returned a special verdict in which it awarded $3,000,000 for the 180-day notice period and $24,903,865 in damages for the years beyond the notice period.

The jury also found against DHL on the contract claims that had survived summary judgment.  Specifically, the jury decided DHL's "White Space" reduction in shipping services constituted a breach of contract and awarded $2,500,000 to Unishippers.  The jury also concluded DHL was equitably estopped from relying on the 180-day notice period in the contract to limit damages.  Finally, the jury found that DHL breached the contract by (a) failing to provide Unishippers with the lowest reseller rates, and (b) failing to provide Unishippers a 20% discount on assessorial fees.  For both of these claims, however, the jury awarded no damages.

Notably, while DHL argued that Unishippers waived or should have been equitably estopped from raising its breach of contract claims, the jury found that DHL failed to demonstrate waiver or equitable estoppel by a preponderance of evidence.  Shortly after the jury verdict, DHL moved for judgment as a matter of law.  The court denied its motion.

DHL appealed the court's grant of summary judgment and denial of DHL's motion for judgment as a matter of law.[45]  The Tenth Circuit concluded that the trial court (a) correctly granted summary judgment on the 180-day notice claim, (b) properly denied the motion for judgment as a matter of law on the White Space claim, and (c) erred in instructing the jury that it could award damages outside of the 180-day notice period.[46]  For this reason, the Tenth Circuit affirmed in part, reversed in part, and remanded with instructions for the district court to vacate

---

[45] *Unishippers Global Logistics, LLC v. DHL Exp. (USA), Inc.*, 526 F. App'x 899, 901 (10th Cir. 2013); *see also* Dkt. No. 414-2, at 3 (articulating DHL's view of issues on appeal).

[46] *Id.* at 901.

the jury's award of $24,903,865.[47]   The jury's award of $2,500,000 for the White Space

Restructuring and $3,000,000 for DHL's failure to abide by the 180-day notice period remained

intact.[48]

On remand, Judge Kimball entered a Revised Judgment, which awarded $5,500,000 to

Unishippers, and reduced the award of attorney's fees and costs to $1,350,000.

2.      Plaintiffs' Lawsuit

While the *Unishippers* Litigation was pending, a group of 121 Unishippers franchisees

filed this lawsuit against DHL in March 2009.[49]   Pursuant to a court order, DHL selected four of

the Plaintiff franchisees for conducting discovery and a Phase One Trial.[50]

In April 2009, Plaintiffs moved to consolidate this case with the *Unishippers* Litigation.[51]

DHL opposed the motion, arguing consolidation would complicate the case and jeopardize dates

set in a March 2009 Scheduling Order.[52]   In July 2009, Judge Kimball denied Plaintiffs' Motion

to Consolidate.[53]   Judge Kimball concluded that the cases "involve some of the same issues of

law and fact, [but] consolidation would add many more issues of law and fact to the instant

case."[54]

---

[47] *Id.* at 911.

[48] *Id.* at 910.

[49] Dkt. No. 2.  The franchisees initially filed suit in Louisiana state court, but after the action was removed to federal court, the franchisees dismissed and filed the instant action.  *See* Dkt. No. 414-3.

[50] *See* Dkt. No. 64.

[51] Mot. Consolidate, *Unishippers Global Logistics LLC v. DHL Express (USA), Inc.*, No. 2:08-cv-00894 (D. Utah Apr. 13, 2009).

[52] Opp. Mem., *Unishippers Global Logistics LLC v. DHL Express (USA), Inc.*, No. 2:08-cv-00894 (D. Utah May 1, 2009).

[53] Order, *Unishippers Global Logistics LLC v. DHL Express (USA), Inc.*, No. 2:08-cv-00894 (D. Utah July 1, 2009).

[54] *Id.*  The Honorable Bruce S. Jenkins ordered consolidation of the two cases on October 2009.  Three months later, Judge Kimball ordered deconsolidation, but continued to preside over the case.

In the interim, Plaintiffs and DHL disputed the best manner for proceeding with complex discovery.  Plaintiffs sought and obtained an order that divided discovery into phases.[55]  After DHL selected the first group of franchisees, Plaintiffs moved for and obtained an order granting separate trials, staying discovery against other franchisees, and reserving the preclusive effect of the Phase One trial for future motion practice.[56]

In August 2011, Plaintiffs filed a Fourth Amended Complaint.[57]  Relevant to the pending motions, Plaintiffs alleged that DHL breached the Agreement in several ways: "(1) Withdrawing shipping services to 'White Spaces;' . . . (5) Failing to provide at least 180 days notice prior to terminating the National Account Agreement; . . . (9) Overcharging Plaintiffs for shipments; . . . and (10) Giving [other parties] lower rates than Plaintiffs for shipping services and not giving Plaintiffs a 20% discount on assessorial fees."[58]  In a separate paragraph, which Plaintiffs later identified as their "bad faith" claim, Plaintiffs alleged that "DHL breached the National Account Agreement intentionally and in bad faith and is therefore liable for all damages, foreseeable or not, that are a direct consequence of its actions."[59]

DHL, in turn, filed counterclaims against Plaintiffs.  Relevant to the instant motions, DHL asserted that Plaintiffs failed to pay for shipping services.  DHL sought to recover under

---

[55] Dkt. No. 64.

[56] Dkt. Nos. 81, 100.

[57] Dkt. No. 251.

[58] These allegations are similar but not identical to the jury instructions in the *Unishippers* Litigation.  *See* Dkt. No. 401-7.  Specifically, the jury was instructed that Unishippers alleged the Agreement was breached in the following ways: "(1) By ceasing to provide pickup and/or shipping services to various locations as part of its Summer 2008 'White Space' restructuring program; . . . (3) By violating Section 2.05 of the [Agreement,] which states that 'DHL guarantees that no other reseller will have equal or lower rates for comparable volume of business;' and (4) By violating paragraph 11 of the Amendment 10 to the [Agreement,] which provides that 'in the absence of any agreement, the assessorial fees shall be twenty percent (20%) below any customary DHL rates.'" *Id.* at 16; *see also* Dkt. No. 251, at 31-32 (articulating similar but not identical grounds for declaratory relief).

[59] *Id.* ¶ 132.

theories of account stated, quantum meruit, and open account.  As in the *Unishippers* Litigation, DHL asserted waiver as an affirmative defense.  Specifically, DHL argued that Plaintiffs' "claims are barred, in whole or in part, by the doctrines of ratification and/or waiver."[60]  According to DHL, the waiver arguments in this litigation involve multiple individualized factual issues.

The amount DHL sought to recover for its account stated claim changed over time.  In its original counterclaim, DHL asserted that Plaintiffs owed "at least" the following: Gulf Coast, $351,404; AEA, $505,052; Kasel, $226,736; and Lake, $98,173.[61]  Eighteen months later, DHL moved to amend its counterclaim in order to "conform damages amounts alleged for each of the four Phase One plaintiffs . . . to the amounts set forth in the expert report of DHL's damages expert, Dr. Greg Hallman."[62]  The court granted DHL leave to amend.  Under the Third Amended Counterclaim, DHL asserted that Plaintiffs owed "at least" the following principal: Gulf Coast, $1,324,088; AEA, $303,743; Kasel, $809,200; and Lake, $9,759.[63]

In September 2011, Judge Kimball resolved cross-motions for partial summary judgment on the issue of whether Plaintiffs were third-party beneficiaries of the Agreement and Reseller Agreement.[64]  Judge Kimball concluded, "[T]he unambiguous terms of the National Account Agreement and the Reseller Agreement demonstrate that the contracting parties clearly intended to provide benefits to Plaintiffs that were separate and distinct from those conferred upon

---

[60] Dkt. No. 276, at 18.

[61] Dkt. No. 48.

[62] Dkt. No. 327, at 2.  ("DHL does not seek to assert new or additional claims against the Plaintiffs, but merely to correct the damage totals to reflect information produced in discovery and incorporated into Dr. Hallman's report.").

[63] Dkt. No. 397.

[64] Dkt. No. 294.

Unishippers."[65]  After citing examples, Judge Kimball stated, "Moreover, the [A]greements expressly stated and acknowledged that the franchisees had rights under the Agreements and that the franchisees had a direct contractual relationship with DHL."  Recognizing that a beneficiary and contracting party may enforce overlapping duties, Judge Kimball held, "[B]oth Plaintiffs and Unishippers can recover for DHL's breach of the same covenants."  The decision acknowledged the damages suffered by Plaintiffs or Unishippers may differ.  Absent from the decision was any express reference to Amendment 10 or Section 2.05 of the Agreement.

With this background in mind, the court will turn to the various motions for partial summary judgment now pending.

## ANALYSIS

## I.   STANDARD FOR SUMMARY JUDGMENT

The court grants summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[66]  "A material fact is one that might affect the outcome of the suit under the governing law, and a genuine issue is one for which the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[67]  When evaluating a motion for summary judgment, the court must "view the evidence and make all reasonable inferences in the light most favorable to the nonmoving party."[68]

---

[65] Dkt. No. 294, at 3-4. ("For example, DHL agreed to provide its services *directly* to the franchisees for resale. DHL agreed to allow the franchisees to resell DHL's services.  DHL gave specialized pricing directly to the franchisees, billed the franchisees directly, collected payment directly from the franchisees, and had contractual rights to default the franchisees individually and separately if the franchisees did not comply with their obligations.").

[66] Fed. R. Civ. P. 56(a).

[67] *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008) (internal quotation marks and citation omitted).

[68] *N. Natural Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008).

## II.   MOTION FOR PARTIAL SUMMARY JUDGMENT ON ISSUE PRECLUSION

Plaintiffs move for summary judgment on three contract claims under a theory of nonmutual offensive collateral estoppel.  According to Plaintiffs, a jury, a trial court, and the Tenth Circuit have already concluded DHL breached the Agreement in the *Unishippers* Litigation in at least three respects: "(1) by reducing its domestic services to White Space areas, (2) by ceasing to provide domestic services, without adequate notice, and (3) by overcharging for shipments and assessorials."[69]  Plaintiffs maintain that this court should apply issue preclusion, grant summary judgment in their favor, and ask a jury to fix damages for these breaches.

### A.   Issue Preclusion Standard

Issue preclusion "bars a party from relitigating an issue once it has suffered an adverse determination on the issue, even if the issue arises when the party is pursuing or defending a different claim."[70]  Issue preclusion applies when four elements have been met:

> (1) the issue previously decided is identical with the one presented in the action in question, (2) the prior action has been finally adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party . . . to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.[71]

The Tenth Circuit has characterized issue preclusion as a doctrine "designed to prevent needless relitigation and bring about some finality to litigation."[72]  Issue preclusion may apply to "issues of law and issues of fact if those issues were conclusively determined in the prior action."[73]

---

[69] Dkt. No. 400, at 2.

[70] *Park Lake Res. Ltd. Liab. v. U.S. Dep't Of Agr.,* 378 F.3d 1132, 1136 (10th Cir. 2004); *see also Dodge v. Cotter Corp.,* 203 F.3d 1190, 1198 (10th Cir. 2000) ("When an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.").

[71] *Park Lake*, 378 F.3d at 1136.

[72] *Moss v. Kopp*, 559 F.3d 1155, 1161 (10th Cir. 2009).

[73] *United States v. Stauffer Chem. Co.*, 464 U.S. 165, 170-71 (1984).

Additional considerations apply when a nonparty to the prior adjudication attempts to invoke issue preclusion.[74] Courts often refer to this strategy as "nonmutual offensive collateral estoppel."[75] Trial courts have "broad discretion to determine when offensive, non-mutual collateral estoppel should be applied."[76] Generally, nonmutual offensive collateral estoppel should not be applied when a party could have participated in the underlying litigation but chose not to, or where it would be unfair to the nonmovant.

**B.      Issue Preclusion Analysis**

DHL does not contest that it participated as a party in the prior litigation, but instead argues that Plaintiffs cannot prove the three remaining issue preclusion elements: identity of issues; final resolution on the merits; and a full and fair opportunity to litigate the issue in the earlier action. The court will address the disputed elements in turn.

1.      Identity of Issues

The first question presented is whether the issues in the prior adjudication are identical to the issues in the present case.  Plaintiffs maintain that three contractual claims and a waiver issue here are identical to those presented in the *Unishippers* Litigation.  DHL disagrees, arguing that DHL's breaches of the Agreement as to Unishippers present different issues than the third-party breach claims relating to the franchisees as third-party beneficiaries.

The Tenth Circuit has cautioned that issue preclusion applies when "the precise question at issue [was] raised and determined in the prior suit."[77]  Issue preclusion may be inappropriate if

---

[74] *Dodge v. Cotter Corp.*, 203 F.3d 1190, 1198 (10th Cir. 2000) (citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331 (1979)).

[75] *See, e.g.*, *United States v. Mendoza*, 464 U.S. 154, 157-58 (1984).

[76] *Coburn v. Smithkline Beecham Corp.*, 174 F. Supp. 2d 1235, 1239 (D. Utah 2001).

[77] *Fulsom Const. Co. Inc. v. U.S. Fid. & Guar. Co.*, No. 04-6087, 2005 WL 2542860, at *3 (10th Cir. Oct. 12, 2005).

there is uncertainty about whether a specific issue was resolved.[78]  In evaluating whether the issues are identical, courts often consider the previous jury instructions, special verdict form, any findings of fact or conclusions of law, and the prior judgment.[79]

The Tenth Circuit's decision in *Dodge v. Cotter Corp.* is instructive.[80]  In *Dodge*, a group of plaintiffs sued a company for negligently operating a uranium mill over a forty-year period. After a jury returned a verdict against the company, a second group of plaintiffs invoked issue preclusion and attempted to use the jury's verdict to establish negligence for personal injuries. On appeal, the Tenth Circuit held that the trial court improperly applied issue preclusion because it was "not possible to know the compass of the [prior] jury's finding of negligence."[81] Specifically, the Tenth Circuit concluded that the "jury instructions, our blueprint for determining the parameters of the first jury's verdict, sabotage the existence of the first element."[82]

The Tenth Circuit went on to explain that the prior complaint "contained eleven specific allegations of negligence" and included a nonexhaustive "catalog of specific negligent acts."[83] Despite this level of detail, the jury received a general question for whether the company was negligent.  The Special Verdict Form failed to identify the particular duty that was breached or "what negligent act formed the basis of the general finding of negligence."[84]  On appeal, the court rejected the plaintiffs' argument that the specific acts of negligence could be inferred from

---

[78] *Id.* (concluding court erred in determining liability was preclusive when verdict did not include a damages award).

[79] *See, e.g., Dodge v. Cotter Corp.*, 203 F.3d 1190, 1198 (10th Cir. 2000); *see also RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1291 (5th Cir. 1995) (citing 18 Charles A. Wright et al., Federal Practice & Proc. § 4420 (2d ed.)).

[80] 203 F.3d 1190 (10th Cir. 2000).

[81] *Id.* at 1197.

[82] *Id.* at 1198.

[83] *Id.*

[84] *Id.*

16

references to releases, in part because the jury's findings could have been based on negligent acts unrelated to the releases.[85]  Accordingly, the court could not "say as a matter of law the issue decided by the first jury is identical to the issue in controversy in this case."[86]

After careful consideration, the court concludes that DHL's failure to give a 180-day termination notice and the White Space Restructuring claim present identical issues in this case and the *Unishippers* Litigation.  Comparison of the pleadings, jury instructions, and special verdict form in the *Unishippers* legislation demonstrates that the jury in this case will be asked to determine the same issues resolved in the *Unishippers* Litigation, namely whether DHL failed to give notice 180 days before it terminated the Agreement by ceasing to provide domestic services, and whether the White Space Restructuring constituted a breach.  Although the precise damages suffered will vary from franchisee to franchisee, DHL may not retest factual issues that have already been determined against it.  Moreover, DHL's principal authority—the *Dodge* decision— is distinguishable.[87]  Unlike in that case, the special verdict form in the *Unishippers* Litigation specifically identified the basis for the contractual breach.[88]  This is precisely the liability issue presented by Plaintiffs in this case.

---

[85] *Id.* ("[O]ur concern is not that the jury did not find negligence on one or more specific allegations, but that the general finding under the negligence instruction fails to identify what the jury found sustained by the evidence.").

[86] *Id.* at 1199 (rejecting argument that reference to "bellwether" suggested jury intended specific findings would be binding on future plaintiffs).

[87] DHL relied on *Dodge* during oral argument.  In its briefing, DHL relied primarily on *Resolution Trust Corp. v. Keating*, 186 F.3d 1110 (9th Cir. 1999).  The Ninth Circuit's decision is unpersuasive for two reasons.  First, it is factually distinguishable.  Second, it hinged on the existence of fiduciary duties toward different parties.  *Id.* at 1118.  Insofar as DHL contends that the existence of a contract is "hotly contested," the court concludes that Plaintiffs' third-party beneficiary status presents a legal issue, as discussed below.

[88] DHL argues that issue preclusion should not apply because the jury in the *Unishippers* Litigation never determined the existence of a prior breach or the damages suffered specifically by Plaintiffs.  Dkt. No. 412, at 3-6.  DHL's restrictive interpretation of the special verdict form and the doctrine of issue preclusion is unpersuasive.  As discussed above, the jury considered an identical liability issue in the *Unishippers* Litigation.  And DHL has not cited any authority for the proposition that the special verdict form in the prior adjudication must expressly reference franchises in order for issue preclusion to apply.  Because the jury in this case will determine damages,

At the same time, however, the court concludes that Plaintiffs have not demonstrated that the overcharge and waiver issues are identical in the two cases, at least at this stage of litigation. The overcharge and waiver issues differ substantively from DHL's failure to give adequate termination notice or the White Space Restructuring.  It would be inconsistent for this court to find that DHL's failure to give the contractually agreed upon notice or a significant change to the range of domestic services constituted a breach of the Agreement as to Unishippers but not as to the third-party beneficiaries.  But this is not so for the overcharge claim or waiver defense because these two issues may present legal and evidentiary issues unique to each of the franchisees.  For example, a jury could find that Unishippers did not waive its rights under the Agreement, but at the same time find that one or more franchisees did waive rights through their conduct.

Moreover, the overcharge and waiver issues present the same challenge that existed in the *Dodge* decision, where lack of clarity surrounding the jury determination barred issue preclusion. The jury in the *Unishippers* Litigation was asked to determine whether waiver applied to Unishippers.  There is no indication the jury considered whether the franchisees waived their rights under the Agreement or whether Unishippers had the authority to waive the franchisees' rights.  For the overcharge and assessorial fee claims, it is not clear whether the jury found that DHL breached Amendment 10 or Section 2.05.  The jury did not expressly award damages for these claims, which is a necessary element of breach of contract.  And here, the parties present reasonable but conflicting interpretations of the basis for the jury's award of damages for the

---

DHL has not shown that these two contract issues—notice and the White Space Restructuring—are so different between Unishippers and its franchisees as to preclude application of the doctrine.

other contract claims.  Under *Dodge*, Plaintiffs failed to demonstrate sufficient identity of issues for the overcharge claim and waiver defense.

In sum, the court finds that Plaintiffs' and Unishippers' claims arising out of DHL's failure to give 180-day notice and the White Space Restructuring present identical issues to those previously determined.  The overcharge and waiver issues, however, are not sufficiently identical for issue preclusion.

2.       Resolution on Merits

The second issue is whether the prior adjudication resolved the issues on the merits.[89]  In the Tenth Circuit, a party satisfies this element by demonstrating "that the adjudication [was] necessary to the judgment."[90]  In *Murdock v. Ute Indian Tribe of Uintah & Ouray Reservation*, the Tenth Circuit observed that a judgment is conclusive when the facts and issues are essential to the judgment.[91]  For example, the court held that issue preclusion applied to a discrete issue because the court in the prior litigation had to reach the issue in order to resolve the claim.[92]  In contrast, in *Affiliated Ute Citizens of Utah v. Ute Indian Tribe of Uintah & Ouray Reservation*, the Tenth Circuit concluded that a trial court's ruling on sovereign immunity would not be given preclusive effect because the court later determined it lacked subject-matter jurisdiction, which rendered moot the prior sovereign immunity ruling and made it irrelevant to judgment.[93]

---

[89] Having concluded that the overcharge and waiver issues are not identical to the issues previously adjudicated, the court constrains its analysis of the remaining issue preclusion elements to the 180-day notice and the White Space Restructuring issues.

[90] *Murdock v. Ute Indian Tribe of Uintah & Ouray Reservation*, 975 F.2d 683, 687 (10th Cir. 1992).

[91] *Id.*

[92] *Id.*

[93] *Affiliated Ute Citizens of State of Utah v. Ute Indian Tribe of Uintah & Ouray Reservation*, 22 F.3d 254, 256 (10th Cir. 1994).

DHL maintains that disputed facts prevent this court from deciding whether issues were resolved on the merits in the *Unishippers* Litigation.  Specifically, DHL argues each individual franchisee must prove the existence of damages and the particular effects of the White Space Restructuring on each franchisee before issue preclusion can apply.  This restrictive application of the elements of issue preclusion is inconsistent with the doctrine, which serves to promote judicial efficiency, prevent inconsistent outcomes, and protect parties from "the burden or relitigating identical issues."[94]  Here, a jury found that DHL breached the Agreement by failing to provide notice and by adopting the White Space Restructuring.[95]  The court entered a judgment based on its prior decisions and the jury's verdict.  The Tenth Circuit affirmed the basic determination of liability.

In short, while the extent of the harm suffered may differ from franchisee to franchisee, the issue of whether DHL breached the Agreement, at least insofar as the notice and White Space claims are concerned, has been decided on the merits.  Admittedly, the damages suffered by each franchisee may vary in part depending on its location, business volume, and customers.  But it is not inconsistent with the doctrine of issue preclusion to instruct a jury that a breach occurred on a particular date and then ask the jury to determine the amount of damages for each franchisee.

Despite the prior adjudication on the merits, DHL insists that a party seeking to prevail on a breach of contract claim must demonstrate four elements, one of which is damages.[96]  In

---

[94] *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979); *cf. Nichols v. Bd. of Cnty. Comm'rs of Cnty. of La Plata, Colo.*, 506 F.3d 962, 967 (10th Cir. 2007).

[95] DHL briefly argues that the *Unishippers* Litigation did not determine the contract had terminated.  Dkt. No. 412, at 7-8.  The court disagrees.  Similar to *Murdock*, the finding of termination was implicit, if not central, to Judge Kimball's partial summary judgment decision, the judgment, and the Tenth Circuit's holding.  *Compare Murdock*, 975 F.2d at 688, *with* Dkt. No. 401-6, at 7.

[96] Throughout its briefing, DHL characterizes the variation in damages as an individualized issue of fact and argues that issues of disputed fact preclude summary judgment.  The court finds that DHL has not created a

DHL's view, parties cannot invoke issue preclusion until they demonstrate individualized damages for each franchisee. This approach to issue preclusion is unpersuasive because it would preclude the application of issue preclusion whenever damages were an element of a claim. Possible variations in damages or possible defenses do not prevent finding that two of the contract issues in this case—breach of the notice provision and the White Space Restructuring— were identical to and resolved on the merits in the *Unishippers* Litigation.[97]

In sum, Plaintiffs satisfied the second element of issue preclusion for the notice claim and the White Space Restructuring. The court will now consider whether DHL had a full and fair opportunity to litigate these two issues.

### 3.    Full and Fair Opportunity to Litigate

The third issue presented is whether DHL had a "full and fair opportunity to litigate the issue in the prior action."[98] Courts inquiring into this element "focus on whether there were significant procedural limitations in the prior proceeding, whether the party had the incentive to litigate fully the issues, or whether effective litigation was limited by the nature or relationship of

---

genuine issue of material fact. Even assuming the truth of these minor variations, it does not change the court's conclusion that Plaintiffs are entitled to issue preclusion on liability but not damages.

[97] Similarly, DHL argues that (a) it continued to provide services after the termination of the Agreement and (b) the White Space Restructuring affected each franchisee differently. In DHL's view, this creates a factual issue on the second element of issue preclusion. Dkt. No. 412, at 8-11. But these "disputed" facts and theory do not change the fact that a prior adjudication concluded DHL breached the Agreement by failing give notice and through the White Space Restructuring. Instead of affecting issue preclusion, DHL's argument appears to be directed at the scope of damages, its counterclaims, and possible defenses, all of which may still be raised at trial.

[98] *Park Lake Res. Ltd. Liab. v. U.S. Dep't Of Agr.*, 378 F.3d 1132, 1136 (10th Cir. 2004).

the parties."[99]  This issue preclusion element also "centers on the fundamental fairness of preventing the party from relitigating an issue he has lost in a prior proceeding."[100]

Here, Plaintiffs argue DHL had a full and fair opportunity to litigate these issues because DHL was actively involved in the summary judgment phase and participated in a jury trial.  In response, DHL argues that it could not explore "critical factual issues applicable to Plaintiffs" in the prior litigation.[101]  Specifically, DHL believes that it should have been able to introduce and explore franchisee agreements governing the relationship between Unishippers and Plaintiffs.

The court concludes that DHL had a full and fair opportunity to litigate whether its failure to provide adequate notice and the White Space Restructuring breached the parties' Agreement.  DHL participated in years of discovery, argued its claims and defenses in motion practice, presented its case to a jury, and received the benefit of an appeal.  Moreover, throughout the *Unishippers* Litigation, DHL had an incentive to fully litigate the White Space Restructuring and the notice claims—especially where, as here, DHL was aware of a related suit arising out of the same subject matter.

DHL has not pointed to a significant procedural limitation in the *Unishippers* Litigation. Even if there was no opportunity to introduce franchisee agreements in the prior suit, DHL has not shown how a risk assumption agreement between franchisees and Unishippers has bearing on whether DHL breached its obligations to Unishippers and third-party beneficiaries under an

---

[99] *Murdock v. Ute Indian Tribe of Uintah & Ouray Reservation*, 975 F.2d 683, 689 (10th Cir. 1992) (quoting *SIL-FLO, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1521 (10th Cir. 1990)).

[100] *SIL-FLO, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1521 (10th Cir. 1990) (concluding party's attempt to relitigate choice of law issue merely because the party lost in the prior proceeding did not deprive party of full and fair opportunity).

[101] Dkt. No. 412, at 19.

entirely different agreement.[102]   Stated differently, DHL has not shown that specific procedural

limitations in the prior suit deprived it of a full and fair opportunity to litigate its failure to

provide adequate notice and the White Space Restructuring.[103]

For all these reasons, Plaintiffs satisfied the final element of issue preclusion.  The only

remaining question is whether nonmutual offensive collateral estoppel should extend to this case.

## C.    Nonmutual Offensive Collateral Estoppel

The final issue is whether the court should exercise its discretion and permit Plaintiffs to

invoke nonmutual collateral estoppel.  In *Parklane Hosiery Co., Inc. v. Shore*,[104] the Supreme

Court sanctioned the use of nonmutual offensive collateral estoppel.  The Court cautioned that

the doctrine should not apply when "a plaintiff could easily have joined the earlier action" or

when "the application of offensive estoppel would be unfair to a defendant."[105]  Discussing the

fairness inquiry, the Court suggested that courts should consider whether there was an incentive

for a party to "defend vigorously," inconsistent judgments in multiple prior suits, or "procedural

opportunities unavailable in the first action that could readily cause a different result."[106]

Under *Parklane*, this court's first inquiry should be whether Plaintiffs could have joined

in the *Unishippers* Litigation.  Here, the parties dispute the effect of a state case in another

---

[102] DHL also argues that it did not have an opportunity to present evidence relevant to its waiver defense in the underlying litigation.  Because the court concludes that issue preclusion should not extend to waiver, it does not reach this issue.

[103] DHL briefly suggests Judge Kimball should have permitted it to file a sur-reply at the summary judgment stage of the *Unishippers* Litigation.  Yet, DHL fails to explain what prevented it from raising this issue during the appeal to the Tenth Circuit.  Accordingly, the court concludes that DHL's waiver of this argument in the prior case did not deprive it of a full and fair opportunity to litigate the issue.

[104] 439 U.S. 322, 331-32 (1979).

[105] *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 331 (1979).

[106] *Id.* (holding estoppel applied, where party probably could not have joined the litigation, the likelihood of successive suits incentivized a vigorous defense, the prior judgment was not inconsistent with any other prior judgment, and there were no new procedural opportunities).

jurisdiction, and the timeliness of Plaintiffs' attempt to join the *Unishippers* Litigation.  After considering the parties' arguments, however, the court concludes that Plaintiffs attempted to participate in the *Unishippers* Litigation but were denied the opportunity to do so.  The existence of a related case, which was later abandoned, or an insignificant delay in attempting to join the prior case does not change the fact that Plaintiffs attempted to join the *Unishippers* Litigation relatively early in that case.  Indeed, while DHL attempts to articulate litigation strategies that Plaintiffs could have employed,[107] the court notes that DHL opposed Plaintiffs' motion to consolidate, citing the complexity of the legal and factual issues.  This strongly suggests that DHL would have attempted to deny Plaintiffs the opportunity to participate in the prior litigation. In any event, because Judge Kimball denied Plaintiffs' motion to consolidate, the court cannot conclude that Plaintiffs intended to adopt the type of "wait and see attitude" that would weigh against estoppel.[108]  Accordingly, the procedural history of these two cases favors permitting Plaintiffs to invoke issue preclusion.[109]

The second consideration is whether it would be unfair to DHL to permit invocation of offensive collateral estoppel.  As discussed above, DHL had a full and fair opportunity to litigate identical issues in the prior suit.  DHL has not persuaded the court that it could avail itself of any procedural advantages that were unavailable in the *Unishippers* Litigation.  And issue preclusion in this case does not implicate any prior inconsistent judgments.  In sum, DHL has not shown that nonmutual offensive collateral estoppel would be unfair under *Parklane*, especially where,

---

[107] Dkt. No. 412, at 21-22.

[108] *See Parklane Hosiery Co.*, 439 U.S. at 329-30 (discussing policy considerations).

[109] In its papers, DHL also argues that Plaintiffs' division of this case into phases weighs against nonmutual offensive collateral estoppel insofar as it decreases judicial efficiency.  This argument is unpersuasive.  Plaintiffs' attempt to make a complex case more manageable is irrelevant to (1) Plaintiffs unfairly participating in the prior adjudication, or (2) whether DHL was denied a full and fair trial in the prior adjudication.

as here, DHL will still have an opportunity to try the issue of damages and present legal defenses specific to the franchisees.

In response, DHL argues that nonmutual offensive collateral estoppel is inappropriate when its application would not promote judicial efficiency.[110]  In doing so, DHL relies on cases from other jurisdictions that arose in factually distinguishable contexts.[111]  In the court's view, none of these cases stands for the proposition that an inquiry into judicial efficiency supplants the factors identified by the Supreme Court in *Parklane* and used in the Tenth Circuit.  Moreover, the court disagrees that the application of issue preclusion would undercut judicial efficiency or confuse a jury.  Issue preclusion in this case would reduce Plaintiffs' evidentiary burden and reduce the likelihood of inconsistent judgments.  While Plaintiffs likely will present evidence of other breaches of the Agreement and DHL will advance its defenses, there is no indication that the application of issue preclusion in this case will involve such intertwined or complex issues that the jury will be unable to apply the court's instructions and resolve this dispute.

In sum, the court finds that the *Parklane* factors weigh in favor of permitting Plaintiffs to invoke nonmutual offensive collateral estoppel respecting issues resolved in a prior adjudication.

D.    Summary

Plaintiffs' Motion for Partial Summary Judgment on Issue Preclusion is granted in part. Although the exact language of the jury instruction is reserved for trial, the court will instruct the jury that DHL breached the Agreement by failing to provide notice within 180 days, and that the

---

[110] Dkt. No. 412, at 22-25.

[111] *See Rodriguez-Garcia v. Miranda-Marin*, 610 F.3d 756, 773 (1st Cir. 2010) (concluding trial court did not err in declining to provide a jury instruction that would confuse the jury and not promote judicial economy in an intertwined employment discrimination suit); *Acevedo-Garcia v. Monroig*, 351 F.3d 547, 577 (1st Cir. 2003) (acknowledging that interrelated issues may provide a reason for denying issue preclusion but remanding for consideration of the issue); *S.E.C. v. Monarch Funding Corp.*, 192 F.3d 295, 304 (2d Cir. 1999) (discussing whether sentencing findings should be given preclusive effect in civil case).

White Space Restructuring constituted a breach of the Agreement.  At the same time, application of issue preclusion does not preclude DHL from challenging the overcharge claims, presenting affirmative defenses based on the franchisees' conduct, or trying the issue of damages.[112]

## III.    Motion for Summary Judgment on Plaintiffs' Contract Claims

DHL moves for partial summary judgment on the franchisees' contract claims.[113]  DHL's motion raises two issues: (1) whether Plaintiffs may proceed under a breach of contract theory based on DHL's purported bad faith; and (2) whether Plaintiffs' claim for breach of Section 2.05 and Amendment 10 fails as a matter of law.  The court considers each in turn.

### A.    "Bad Faith" Breach of Contract Claim

The first issue is whether Plaintiffs may proceed on a claim for "bad faith" breach of contract, where the Agreement contains a provision obligating DHL "to deal with" Unishippers and its franchisees "in good faith in all aspects of this Agreement."[114]

Under Utah law, a party may recover for an express breach of contract.[115]  Alternatively, separate and apart from express provisions, a party may seek to recover for breach of the implied covenant of good faith and fair dealing, which inheres in every contract.[116]  At the same time,

---

[112] *See* Dkt. No. 424, at 1-3 (clarifying DHL may present affirmative defenses and litigate damages).

[113] Dkt. No. 402.

[114] Dkt. No. 403-2, § 5.05 ("[DHL] agrees to deal with [Unishippers] and [Unishippers] Franchisees in good faith in all aspects of this Agreement and to provide [Unishippers] shipping rates consistent with market trends and conditions.").

[115] *Christiansen v. Farmers Ins. Exch.*, 116 P.3d 259, 261 (Utah 2005).

[116] *Id.* at 261-62 (discussing differences between express provisions and the implied covenant of good faith and fair dealing); *see also Blakely v. USAA Cas. Ins. Co.*, 633 F.3d 944, 947 (10th Cir. 2011) (discussing breach of contract under Utah law).

however, Utah courts do not permit recovery of punitive damages for "bad faith" or intentional breach of contract.[117]

DHL's motion presents two difficulties.  First, the Agreement between the parties contains a provision that obligated DHL to act in good faith.  Utah does not recognize a tort claim for bad faith breach of contract.  But a party may recover for breach of an express contractual provision.  Second, Plaintiffs presented contradictory views of their claim during oral argument and in their papers.  At times, Plaintiffs characterize their claim as a breach of an express provision that obligates DHL to act in good faith.  At other times, Plaintiffs cast their claim as a breach of the implied covenant of good faith and fair dealing.

After careful consideration of the pleadings, the court concludes that Plaintiffs' Fourth Amended Complaint alleges an express breach of Section 5.05 of the Agreement.  Specifically, Plaintiffs appear to allege DHL was contractually obligated to "deal with" Plaintiffs "in good faith in all aspects of the agreement."[118]  This claim includes more than mere negotiations of the Reseller Agreement, incorporating allegations of driving away customers, refusing to provide shipping guarantees, removing drop boxes, and refusing to accurately bill for services.[119]  Insofar as these acts fall under Section 5.05, they are not barred by Utah law.  Indeed, DHL has not cited to any binding or persuasive precedent that prevents a party from seeking to recover under a contractual provision negotiated by the parties, merely because that provision uses the phrase "good faith."

---

[117] *TruGreen Companies, L.L.C. v. Mower Bros., Inc.*, 199 P.3d 929, 933 (Utah 2008).  In *TruGreen*, the Utah Supreme Court discussed the policy reasons for limiting damages for breach of a "contractual non-competition, non-disclosure, or employee non-solicitation provision."  *Id.* at 934.  As part of this policy discussion, the court stated: "[W]e do not wish to adopt a remedy for breach of contract that punishes the breaching party. . . . Contract law is amoral and, therefore, appropriate in a business setting in which efficiency is valued."  *Id.* at 933.

[118] Dkt. No. 401-1, § 5.05; Dkt. No. 411, at 9-10.

[119] Dkt. No. 411, at 9-10.

At the same time, however, the court concludes that Plaintiffs have not asserted a claim for breach of the implied covenant of good faith and fair dealing.  Throughout their papers and at the hearing, Plaintiffs treated the claim for breach of an implied covenant as interchangeable with a breach of the express provision in the contract.[120]  This approach does not comport with Utah law, which treats express provisions and the implied covenant as separate theories of recovery.[121]  The Fourth Amended Complaint contains a single paragraph for the bad faith claim.[122]  Neither that paragraph nor the pleading references the implied covenant of good faith and fair dealing.  In this respect, the Fourth Amended Complaint failed to place DHL on adequate notice if Plaintiffs intended to pursue an implied covenant claim.  At best, the Fourth Amended Complaint states a claim for breach of Section 5.05.  At worst, it alleges a tort claim for bad faith breach of contract, which would not be cognizable under Utah law.  But this court is unable to construe the relevant paragraph of the Fourth Amended Complaint to simultaneously state a claim for breach of an express provision and an implied covenant.

In sum, DHL correctly asserts that Utah does not permit recovery of punitive damages for an intentional breach of contract.  To the extent that Plaintiffs seek recovery of punitive damages, the "bad faith" claim is barred.   But Plaintiffs may pursue their claim for breach of Section 5.05 at trial.[123]  In that respect, DHL's motion for summary judgment is denied.

---

[120] *See, e.g.*, Dkt. No. 411, at 12; Dkt. No. 433, at 40-41.

[121] *See Christiansen v. Farmers Ins. Exch.*, 116 P.3d 259, 261 (Utah 2005).

[122] Dkt. No. 251, ¶ 132.

[123] In its reply, DHL briefly contends the court should grant summary judgment because Plaintiffs failed to present evidence in support of the bad faith claim.  Dkt. No. 427, at 3-4.  This argument falls outside the scope of DHL's motion, which argued that summary judgment was appropriate because (1) Utah law does not recognize the claim and (2) Plaintiffs did not participate in negotiations.  Dkt. No. 402, at 15-17.  DHL's motion did not place Plaintiffs on adequate notice of a challenge to the evidentiary sufficiency of its claim.  Because it was raised for the first time on reply, the court declines to consider the argument.

**B.** **Overcharge Claims**

DHL also moves for summary judgment on contractual claims arising under Section 2.05 of the Agreement and Amendment 10.  In its opening brief, DHL argues that (1) Plaintiffs are not third-party beneficiaries of either of these provisions and (2) Plaintiffs cannot present sufficient evidence of a claim for breach of Section 2.05.

1.      Third-Party Beneficiary

The parties dispute whether Plaintiffs were intended third-party beneficiaries under Section 2.05 or Amendment 10, neither of which expressly references Unishippers or its franchisees.

In Utah, courts determine whether an entity is a third-party beneficiary by examining the contract at issue.[124]  "The written contract must show that the contracting parties clearly intended to confer a separate and distinct benefit upon the third party."[125]  For an unambiguous contract, "the parties' intentions are determined from the plain language of the contractual language."[126]  But "if the language of the contract is ambiguous such that the intentions of the parties cannot be determined by the plain language of the agreement, 'extrinsic evidence must be looked to in order to determine the intentions of the parties.'"[127]  Ambiguity exists only when the language is "reasonably capable of being understood in more than one sense."[128]

---

[124] *Wagner v. Clifton*, 62 P.3d 440, 442 (Utah 2002); *see also Broadwater v. Old Republic Sur.*, 854 P.2d 527, 537 (Utah 1993) ("A third party who benefits only incidentally from the performance of a contract has no right to recover under the contract.").

[125] *Wagner*, 62 P.3d at 442 (internal quotation marks and citation omitted).

[126] *Id.* (quoting *WebBank v. Am. Gen. Annuity Serv. Corp.*, 54 P.3d 1139, 1145 (Utah 2002)).

[127] *WebBank*, 54 P.3d at 1145 (internal quotation marks and citation omitted).

[128] *Cent. Florida Investments, Inc. v. Parkwest Associates*, 40 P.3d 599, 605 (Utah 2002) (internal quotation mark and citations omitted).

The court concludes the plain language of the Agreement demonstrates the contracting parties intended to grant franchisees a separate and distinct benefit—namely, to receive lower rates and discounted assessorial fees.  Here, Unishippers and the predecessor of DHL entered into a contract, the purpose of which was to maximize Unishippers' and its franchisees' use of DHL's services.[129]  The primary vehicle for accomplishing this goal was a set of contractual provisions ensuring the rates DHL charged the franchisees remained predictable and affordable.[130]  Unlike in other cases, the rate provisions were not incidental or indirect—the Agreement reflects the parties' intent to ensure that DHL charged Unishippers' franchisees the lowest rates and provided a discount on assessorial fees.[131]

DHL nonetheless insists that Section 2.05 and Amendment 10 were not intended to confer a benefit on the franchisees because these provisions do not expressly refer to them.  DHL cites other provisions in the Agreement expressly referring to Unishippers and its franchisees.  DHL argues the failure to expressly reference franchisees must mean the provisions were intended to benefit only Unishippers.[132]  DHL's position is unpersuasive for two reasons.

---

[129] Dkt. No. 401-1, §§ 2.01-2.05, 3.01, 4.01.

[130] *See* Dkt. No. 401-1, § 2.01-2.05.

[131] *See* Dkt. No. 294, at 3-4 (recognizing parties' agreement envisioned a direct relationship between DHL and the franchisees).  Although his decision did not expressly discuss or analyze Section 2.05 or Amendment 10, Judge Kimball concluded that, under the Agreement, "DHL gave specialized pricing directly to the franchisees, billed the franchisees directly, collected payments directly from the franchisees, and had contractual rights to default the franchisees individually and separately if the franchisees did not comply with their obligations."  While the court declines Plaintiffs' invitation to resolve DHL's motion under the law of the case doctrine, the court is mindful of Judge Kimball's prior conclusions regarding the parties' intent and the basic structure of the Agreement.

[132] Throughout its briefing and at argument, DHL heavily relied on *Wagner v. Clifton*, a decision in which the Utah Supreme Court held that a trial court could not exercise personal jurisdiction on the basis of a contract between third parties.  62 P.3d 440, 442 (Utah 2002).  While *Wagner* provides the standard for evaluating third-party beneficiary status, the holding of the decision is distinguishable insofar as (1) the contractual provision at issue expressly referred to specific parties, and (2) the court was able to distinguish between the forum selection clause and provisions that addressed the relationships between parties and non-parties.  *Id.* at 442-43.  In the instant case, neither Section 2.05 nor Amendment 10 expressly forecloses application to a non-party.  Indeed, other provisions in the Agreement extend rates to all shipments and suggest that the parties intended the benefit to flow to franchisees.

First, while Section 2.05 and the relevant language in Amendment 10 do not specifically reference the franchisees, they also do not specifically refer to Unishippers.[133]  In other words, these provisions do not contain language that would suggest the parties intended the provision should benefit only Unishippers.  And in the absence of limiting language, the court concludes that the Agreement, on whole, evinces the intent of the parties to apply the lowest rate and assessorial fee provisions to all shipments, unless DHL entered into a separate agreement with specific franchisees.  In short, the structure and language of the Agreement demonstrates that the parties intended for franchisees to receive the benefit of DHL's lowest rates and an assessorial fee discount.

Second, DHL's narrow interpretation of Section 2.05 and Amendment 10 threatens to render those provisions, along with the purpose of the Agreement, superfluous.[134]  The Agreement applied to all shipments and created a shipping, billing, and rate relationship between DHL and the franchisees.  The court cannot see how DHL's restrictive reading of Section 2.05 and Amendment 10 could be harmonized with the parties' intent.[135]

For both of these reasons, the court concludes, based on the Agreement and the language of Section 2.05 and Amendment 10, that the parties intended Section 2.05 and Amendment 10 to confer separate and distinct benefits on the franchisees.

In its papers, DHL argues that the court should find in its favor because Section 2.05 refers to a reseller.  At best, the brief reference to "reseller," an otherwise undefined term, suggests that there may be two reasonable interpretations of Section 2.05.  On the one hand, the

---

[133] Dkt. No. 401-1, § 2.05 ("[DHL] guarantees that no other reseller will have equal or lower rates for comparable volume of business."); *Id.* at Amendment No. 10, at 2 ("In the absence of any agreement, the assessorial fees shall be twenty (20%) below any customary [DHL] rates.").

[134] *See Encon Utah, LLC v. Fluor Ames Kraemer, LLC*, 210 P.3d 263, 269 (Utah 2009).

[135] *See* Dkt. 401-1, §§ 3.01, 5.03, 12.02.

term may be synonymous with Unishippers and thus suggest that only Unishippers was entitled

to certain rates.  Alternatively, the term could refer collectively to Unishippers and its

franchisees, suggesting that both would receive lower rates depending on the comparable volume

of other resellers and their franchisees.[136]  If this creates two reasonable interpretations, Utah law

would require this court to evaluate extrinsic evidence presented by the parties to resolve the

ambiguity that arises out of the reference to resellers.  Here, Plaintiffs submitted extrinsic

evidence the contracting parties intended to give franchisees the benefits of Section 2.05.[137]

DHL failed to controvert this testimony.  For this reason, the court concludes extrinsic evidence

independently establishes the parties' intent to make franchisees third-party beneficiaries of

Section 2.05.

 As stated above, the court finds the Agreement's language and structure demonstrate that

the franchisees are third-party beneficiaries of Section 2.05.  But insofar as DHL's interpretation

creates ambiguity as to the reach of the lowest rates provision, extrinsic evidence demonstrates

that the parties intended the franchisees to be third-party beneficiaries of Section 2.05.

 2. Sufficiency of Evidence

 In its opening brief, DHL argues that Plaintiffs cannot demonstrate a breach of Section

2.05 because Plaintiffs cannot present evidence that DHL charged higher rates to a reseller with a

comparable volume of business.[138]  DHL's motion challenges Plaintiffs' ability to prove that (1)

individual franchisees had revenue that could be compared to the volume of other resellers, and

---

[136] This interpretation is consistent with an argument advanced by DHL—that the Agreement uses Unishippers, franchisees, and reseller separately and distinctly.  Dkt. No. 402, at 19.

[137] Dkt. No. 411-1, at 168-69; *see also* Dkt. No. 411, at xvi-xvii (describing testimony).

[138] Dkt. No. 402, at 22.

(2) Unishippers, as a system, had comparable shipping volume to other resellers.[139]  Without this evidence, DHL contends that Plaintiffs will be unable to show a breach of Section 2.05.

A party seeking to recover on a breach of contract theory bears the ultimate burden of demonstrating a breach.  In the Tenth Circuit, a party seeking summary judgment must "carry its initial burden either by producing affirmative evidence negating an essential element of the non-moving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial."[140]  If the movant satisfies its burden, "Rule 56(e) requires the non-moving party to set forth specific facts showing there is a genuine issue for trial."[141]   In this case, DHL carried its initial burden of demonstrating that Plaintiffs could not present evidence of comparable rates under Section 2.05.[142]  Accordingly, the burden of producing evidence of a breach sufficient to survive DHL's motion for summary judgment shifted to Plaintiffs.

In their argument section, Plaintiffs failed to cite evidence sufficient to create a genuine issue of fact for trial.[143]  Rather than cite or discuss specific evidence of rates given to comparable resellers, as required by Rule 56(e), Plaintiffs rely primarily on their argument that the overcharges issue was resolved in the *Unishippers* Litigation.  But as the court discussed

---

[139] *Id.*

[140] *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008) (internal quotation marks and citation omitted).

[141] *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002), *as amended on denial of reh'g* (Jan. 23, 2003); *cf. Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 134 S. Ct. 843, 850 (2014).

[142] Plaintiffs briefly argue that DHL erroneously construes Section 2.05 because DHL argued that franchisees are unable to demonstrate their individual volume compared to other resellers.  According to Plaintiffs, Section 2.05 requires the parties to calculate the aggregate net volume of Unishippers, its franchisees, and account locations.  Plaintiffs' argument, however, ignores the fact that DHL challenged Plaintiffs' ability to present evidence regardless of whether revenues were calculated individually or collectively.  Even assuming Plaintiffs' interpretation is correct, DHL's motion shifted the burden to Plaintiffs to present evidence of a reseller who received lower rates but had comparable volume to the Unishippers system.

[143] *See, e.g.*, Dkt. No. 411, at 19-20 (addressing challenge to evidence).

above, Plaintiffs are not entitled to the benefit of nonmutual offensive collateral estoppel on the overcharge claims because the *Unishippers* Litigation did not definitively resolve whether DHL overcharged franchisees.[144]  In short, Plaintiffs cannot carry their burden under a theory of issue preclusion.

The fact section of Plaintiffs' opposition memorandum briefly references testimony from the *Unishippers* Litigation.[145]  Although it is not clear whether Plaintiffs intended to cite to the pagination in the underlying transcript or the pagination created by CM/ECF, both sections may be relevant to the issue of overcharge.[146]  Specifically, in the *Unishippers* Litigation, Joe Curtis, a former DHL employee responsible for the company's obligations under Section 2.05, testified that the Agreement prohibited DHL from providing lower rates to smaller resellers.[147]  Mr. Curtis testified that DHL continued to give some resellers discounted rates for existing customers, even after Unishippers protested that it was not receiving the lowest rates.[148]

The difficulty with this testimony, at least for the Phase I Plaintiffs, is twofold.  First, it is not clear whether Plaintiffs intended to rely on Mr. Curtis's testimony as an affirmative basis for denying the motion for summary judgment, because Plaintiffs do not even reference the testimony when arguing that they presented sufficient evidence.[149]  The failure to discuss the testimony is problematic because his testimony refers generally to Unishippers, and it is unclear whether Mr. Curtis intended to testify that Plaintiffs received higher rates.  In this respect, Plaintiffs have not shown that the prior testimony, which does not even discuss the rates charged

---

[144] *Supra* Analysis, Part II.

[145] Dkt. No. 411, at 2 (citing Dkt. No. 401-10, at 674-78).

[146] Dkt. No. 401-10, at 664-68, 674-78.

[147] *Id.* at 663-65.

[148] *Id.* at 666-67.

[149] Dkt. No. 411, at 19-20.

to Plaintiffs during specific time periods, provides a sufficient basis upon which a reasonable jury could find that DHL breached its obligation to Plaintiffs under Section 2.05.[150]  Second, Plaintiffs do not provide a basis for concluding that the prior trial transcript is competent evidence here.[151]  At least on the record presented, the excerpt appears to be hearsay.[152]  Plaintiffs have neither argued nor cited any evidence or authority on which the court could find that an exception or exclusion applies.[153]  For both of these reasons, the court concludes that Mr. Curtis's testimony alone does not create a genuine issue of material fact.

Because these four franchisees failed to create a genuine issue of material fact, DHL is entitled to summary judgment on Plaintiffs' claim of breach of Section 2.05 of the Agreement.[154]

During the hearing, DHL argued a similar evidentiary defect should result in summary judgment on Plaintiffs' assessorial fee claim.[155]  The court disagrees.  DHL's challenge to the sufficiency of the evidence for the assessorial fee claim falls well outside the scope of DHL's motion, which challenged the assessorial fee claim solely on the basis of Plaintiffs' status as third-party beneficiaries.[156]  The court cannot grant relief to DHL on the basis of an evidentiary

---

[150] *See* Dkt. No. 433, at 37-39 (challenging evidentiary record).

[151] *Gross v. Burggraf Const. Co.*, 53 F.3d 1531, 1541 (10th Cir. 1995) (holding inadmissible hearsay should not be considered on summary judgment).

[152] Fed. R. Evid. 801(c) (defining hearsay as statement not made "while testifying at the current trial or hearing"); *see Bailey v. S. Pac. Transp. Co.*, 613 F.2d 1385, 1389 (5th Cir. 1980) (treating prior trial testimony as hearsay but admitting testimony under exception for unavailability).

[153] For example, Plaintiffs have not asserted that Mr. Curtis was unavailable to provide a declaration in this case. *See* Fed. R. Evid. 801(b)(1).

[154] While DHL is entitled to summary judgment on claims asserted by Gulf Coast, AEA, Kasel, and Lake, the court does not intend to foreclose the possibility that the other franchisees in this case may be able to come forward with evidence supporting a breach of Section 2.05.

[155] Dkt. No. 433, at 39.

[156] *See* Dkt. No. 402, at i-ii, 22.

challenge where Plaintiffs lacked notice and an opportunity to brief the issue or produce evidence necessary to illustrate a genuine dispute of material fact.[157]

### C.    Summary

DHL's motion for summary judgment on Plaintiffs' contract claims is granted in part and denied in part.  Although Plaintiffs may proceed on their claims that DHL breached Section 5.05 and Amendment 10, DHL is entitled to summary judgment on the lowest rate claim, which arises under Section 2.05 of the Agreement.

## IV.    MOTION FOR SUMMARY JUDGMENT ON DEFENDANT'S COUNTER-CLAIMS

Plaintiffs seek summary judgment on three of DHL's counterclaims: account stated, open account, and quantum meruit.[158]  According to Plaintiffs, a dispute over unpaid shipping services precludes recovery under the doctrine of account stated, while the existence of a contract bars the open account and quantum meruit counterclaims.  The court will analyze the arguments in turn.

### A.    Account Stated Counterclaim

An account stated is essentially a contract to pay a specified sum.[159]  In Utah, the term is "defined as 'an agreement between parties who have had previous transactions of a monetary character that all the items of the account representing such transactions, and the balance struck, are correct, together with a promise, express or implied, for the payment of such balance.'"[160]  To prevail on an account stated claim, a party must satisfy three essential elements: (a) "previous transactions between the parties giving rise to an indebtedness from one to the other"; (b) "an

---

[157] DUCivR 7-1(b)(2); *see, e.g.*, *Montoya v. Apfel*, 2000 WL 556582, at *1 n. 3 (10th Cir. May 8, 2000); *3Form Holdings, Inc. v. Livinglass, Inc., No*. 2006 WL 278454, at *1 (D. Utah Feb. 2, 2006) ("It is generally inappropriate for a court to consider arguments raised for the first time in a reply memorandum.").

[158] Dkt. No. 399.

[159] *DeMentas v. Estate of Tallas, ex rel. First Sec. Bank*, 764 P.2d 628, 634 (Utah Ct. App. 1988).

[160] *Id.* (citation omitted).

agreement between the parties as to the amount due and the correctness of that amount"; and (c) "an express or implied promise by the debtor to pay the creditor the amount owing."[161]

For example, if a board of directors internally resolves to pay a specific amount and the company secretary later sends a letter to the creditor admitting the amount owed and promising to make installment payments, a party may prevail on an account stated claim, even if the company later disputes the basis of the agreement in litigation.[162]   In that type of case, an express promise to pay a specific amount gives rise to a straightforward account stated claim.

More difficult issues arise out of disputes where one party insists the agreement to pay a specific amount may be implied from the other's conduct.   Similar to a contract claim, a party's conduct may form the basis of an agreement that supports a claim for account stated.   For example, in the absence of express agreement between the parties, "assent may be inferred by silence when an account rendered remains unquestioned a reasonable time after receipt."[163]   In this case, neither Plaintiffs nor DHL cite to any Utah authority that provides a metric for evaluating whether the parties in this case failed to object or question the relevant invoices within a reasonable time.[164]   Other jurisdictions, however, have held that a party's failure to

---

[161] *Id.* (citation omitted); *see, e.g., Dale K. Barker Co., P.C. v. Valley Plaza*, 541 F. App'x 810, 814 (10th Cir. 2013) (concluding plaintiff failed to demonstrate that defendant acknowledged an agreement of the amount due and its correctness, even though parties signed boilerplate language and defendant sent periodic notices).

[162] *Hurd v. Central Water Co.*, 106 P.2d 775, 777-78 (Utah 1940).

[163] *Lantec, Inc. v. Novell, Inc.*, 2001 WL 1916256, at *9 (D. Utah May 8, 2001) (citing *Hurd*, 106 P.2d at 777).

[164] DHL cites to *Benites v. Hampton*, 3 P. 206 (Utah Terr. 1884), *appeal dismissed*, 8 S. Ct. 254 (1887).  In *Benites*, the Supreme Court for the Territory of Utah recognized that failure to object to a bill for a specific amount within a reasonable time may support a presumption of an account stated.  *Id.* at 208 ("The same rule applies where a party to an account sends it for payment to the other by mail, if the party to whom it is sent does not, after a reasonable time has passed, express any objection to it, his silence, unexplained, is an implied admission that he has none; that the account is correct, and truly, thought [sic] not conclusively, stated.").  But the court ultimately affirmed dismissal of the case because the appellate record did not have enough information for the court to measure whether a reasonable time had elapsed in between the mailing of the account and the commencement of the suit.  *Id.* at 209-210.  The Utah Supreme Court later cited *Benites* in *Scoville v. Kellogg Sales Co.*, 261 P.2d 933 (Utah 1953).  In *Scoville*, the Court held, without much discussion, that the defendant was entitled to proceed

object to an account for an extended period, such as five months or two years, provided a basis for inferring an agreement to pay a specific amount.[165]

Here, Plaintiffs are entitled to summary judgment on the account stated counterclaim because DHL cannot prove Plaintiffs agreed to a pay a specific amount for past services.[166]  DHL asserts that it can demonstrate the second element—an agreement as to the correct amount due—through the terms of the Agreement and the fact that DHL continued to provide shipping services in late 2008 and early 2009.  In DHL's view, Plaintiffs' failure to object in a timely manner constitutes an implied agreement to pay a specified amount.  The court disagrees for two reasons.

First, no reasonable jury could conclude that Plaintiffs and DHL agreed to "to the amount due and the correctness of that amount" for past services, as required by Utah law.  At least as articulated by the Utah Supreme Court, the account stated inquiry should focus on the parties' conduct and any agreement after services have been rendered and an amount is owed.  Here, DHL admitted that it cannot provide an express agreement describing the specific amount owed for past services in which Plaintiffs agree to the correctness of DHL's invoices.[167]  Instead, DHL attempts to establish the agreement through Plaintiffs' silence.[168]  Yet, Plaintiffs' actions in late 2008 and early 2009 demonstrate vocal disagreements about the correctness of the amount.

Even more problematically, DHL's own view of the amounts owed by franchisees has changed during the course of this case—the amounts in the notices sent by DHL differ from the

---

to the jury on an affirmative defense for account stated, when the plaintiff accepted a check and did not object for eighth months.  *Id.* at 935-36.

[165] *Freeland v. Heron, Lenox & Co.*, 11 U.S. 147, 151 (1812); *Navimex S.A. De C.V. v. S/S N. Ice*, 617 F. Supp. 103, 106 (S.D.N.Y. 1984).

[166] *See* Dkt. No. 415, at 7-9.

[167] *Id.* at v-vii.

[168] Dkt. No. 433, at 14:13-17.

original counterclaim, which in turn differs from the amounts in the operative pleading, which is

based on information obtained and analyzed during the course of this case.  In other words, by

the time DHL finalized the amount owed, Plaintiffs had objected to DHL's invoices and billing

practices by sending correspondence to DHL and by filing this lawsuit.  In this respect, DHL has

not provided any evidence controverting Plaintiffs' declarations that they never agreed to the

correctness of the amount purportedly owed.[169]  Under the undisputed facts of this case, DHL

will be unable to prove that these parties entered into a mutual agreement to pay an agreed upon

amount for past services.[170]

Second, the decisions cited by DHL are distinguishable.  Unlike in *First Union Discount*

*Brokerage Services, Inc. v. Milos*[171] or *Freeland v. Heron, Lenox & Co.*,[172] where the debtor did

not contest the account, Plaintiffs objected to the invoices by ceasing payments and sending DHL

emails objecting to its calculation of the amount owed.[173]  And unlike in *Navimex S.A. De C.V. v.*

*S/S Northern Ice*,[174] the delay in this case appears to be far less than five months.  In this respect,

while DHL correctly asserts that failure to object within a reasonable time may give rise to an

implied agreement that would support an account stated claim, the undisputed facts of this case

do not support a finding that Plaintiffs unreasonably delayed when they stopped payment after

DHL began to limit its domestic services and then objected to the invoiced amounts.  In the

---

[169] *Infra* Background, Part F; *see also* Dkt. No. 399, at 3-5.

[170] DHL relies heavily on the Agreement, the parties' past practices, and the National Account Agreement.  In DHL's view, an existing credit arrangement between two parties forms the basis of an account stated, even if a party objects to the invoice.  The difficulty with this approach, at least applied to this case, is that it makes the second element—"an agreement between the parties as to the amount due and the correctness" of a *past due* amount—irrelevant and blurs the distinction between account stated claims and contract or open account claims.

[171] 997 F.2d 835 (11th Cir. 1993).

[172] 11 U.S. 147 (1812).

[173] *Infra* Background, Part F.

[174] 617 F. Supp. 103, 106 (S.D.N.Y. 1984).

absence of an unreasonable delay, no reasonable jury could conclude Plaintiffs' conduct created an implied agreement to pay the amounts listed in DHL's invoices.

For both of these reasons, DHL failed to proffer evidence from which a reasonable jury could find that Plaintiffs entered into an agreement "as to the amount due and the correctness of that amount."[175]  Accordingly, Plaintiffs are entitled to summary judgment on the claim.

### B.      Open Account & Quantum Meruit Counterclaims

Plaintiffs seek summary judgment on DHL's open account and quantum meruit claims.[176] Plaintiffs maintain that these equitable claims are barred under Utah law because an express contract covers the subject matter of the claims.[177]  DHL responds that neither Utah law nor the Federal Rules of Civil Procedure prevent it from proceeding in the alternative.

In Utah, a party may recover in quantum meruit only after legal remedies have been exhausted.[178]  This is because equitable doctrines provide an alternative basis of recovery where a remedy "does not exist at law."[179]  But "if a legal remedy is available, such as breach of an express contract, the law will not imply" an equitable remedy.[180]  For this reason, "recovery under [quantum meruit] is available only when 'no *enforceable* written or oral contract

---

[175] *DeMentas v. Estate of Tallas, ex rel. First Sec. Bank*, 764 P.2d 628, 634 (Utah Ct. App. 1988) (citation omitted).

[176] Dkt. No. 399, at i.

[177] *See* Dkt. No. 423, at 7 ("Plaintiffs raise a single argument . . . that these equitable claims are not available when there is a legal remedy such as breach of an express contract.").

[178] *E & M Sales W., Inc. v. Diversified Metal Products, Inc.*, 221 P.3d 838, 841 (Utah Ct. App. 2009).

[179] *Am. Towers Owners Ass'n, Inc. v. CCI Mech., Inc.*, 930 P.2d 1182, 1193 (Utah 1996), *abrogated on other grounds by Davencourt at Pilgrims Landing Homeowners Ass'n v. Davencourt at Pilgrims Landing, LC*, 221 P.3d 234 (Utah 2009); *Davies v. Olson*, 746 P.2d 264, 268 (Utah Ct. App. 1987) ("Recovery under *quantum meruit* presupposes that no enforceable written or oral contract exists.").

[180] *Am. Towers Owners Ass'n, Inc.*, 930 P.2d at 1193.

exists.'"[181]   The relevant inquiry is whether there is an express and enforceable "contract

covering the subject matter of the litigation."[182]

   In light of the parties' disputes over the enforceability of the Agreement, the court cannot

grant summary judgment on DHL's quantum meruit or open account counterclaims.[183]   Here, a

jury will be asked to determine who first breached the Agreement and whether the parties may

invoke defenses to recovery.   Until the jury determines whether DHL may enforce the Agreement

against Plaintiffs, it would be inappropriate for this court to dismiss DHL's equitable

counterclaims based on existing Utah case law,[184] which often touches only briefly on the issue

of alternative legal and equitable claims.[185]   The court is also mindful of the general principle

that a party may plead claims in the alternative, even if the claims appear to be facially

contradictory.[186]

---

[181] *Wood v. Utah Farm Bureau Ins. Co.*, 19 P.3d 392, 396 (Utah Ct. App. 2001) (quoting *Bailey–Allen Co. Inc. v. Kurzet*, 876 P.2d 421, 425 (Utah Ct. App. 1994)) (alterations in original).

[182] *Id.*; *Mann v. Am. W. Life Ins. Co.*, 586 P.2d 461, 465 (Utah 1978).

[183] *See Becker v. HSA/Wexford Bancgroup, L.L.C.*, 157 F. Supp. 2d 1243, 1253 (D. Utah 2001) (declining to dismiss equitable claims until the jury determines "there was or was not a binding contract between the parties"); *Firestone Tire & Rubber Co. v. Pearson*, 769 F.2d 1471, 1484 (10th Cir. 1985).

[184] Plaintiffs rely primarily on language from *TruGreen Companies, LLC v. Mower Brothers, Inc.*, 199 P.3d 929 (Utah 2008).   In *TruGreen*, the Utah Supreme Court was asked to consider the appropriate measure of damages for a breach of a covenant not to compete.   *Id.* at 933.   The court held that damages for breach of a noncompetition agreement should not be measured by restitution or unjust enrichment, because recovery under quantum meruit theories sounded in equity and are "used only when no express contract is present."   *Id.*   The *TruGreen* decision, however, did not hold that the mere existence of a contract automatically bars equitable claims.

[185] Similar to *Trugreen*, the decisions cited by Plaintiffs only indirectly address the issue raised in this case.   *See Am. Towers Owners Ass'n, Inc.*, 930 P.2d at 1193 (concluding non-party to contract may not pursue unjust enrichment remedy, when contracting parties "paid the contract price and accepted the work performed as meeting their contract terms"); *Diversified Metal Products, Inc.*, 221 P.3d at 841 (reversing summary judgment in favor of defendant on unjust enrichment claim, despite the existence of a contract, where there was a factual dispute over whether the "unjust enrichment claim arose from a separate agreement, a representation of payment, or a misleading statement regarding payment, apart from the express contract and subcontracts"); *Karapanos v. Boardwalk Fries, Inc.*, 837 P.2d 576, 578 (Utah Ct. App. 1992) (barring quantum meruit claim, but only after finding contract was enforceable); *Mann*, 586 P.2d at 465 (assuming existence of an express contract).

[186] Fed. R. Civ. P. 8(b).

In response, Plaintiffs argue that DHL's equitable claims should be dismissed because (1) DHL did not expressly plead them in the alternative, and (2) DHL's counterclaims incorporate allegations that are applicable to its contract claim. Plaintiffs' reading of DHL's pleading and the Federal Rules of Civil Procedure is overly technical and unpersuasive. Plaintiffs have not cited any binding precedent for the proposition that a party must expressly plead in the alternative.[187] And in federal court, parties often incorporate factual allegations throughout a pleading to ensure that opposing parties have adequate notice of the alternative bases of their claims. Here, DHL may reference factual allegations that support both a breach of contract and equitable claims, but this does not mean that DHL should be barred from pursuing equitable remedies based on the same events if a jury later concludes the Agreement is unenforceable and denies DHL a legal remedy.

In sum, the court concludes that DHL may continue to pursue its legal and equitable claims until a jury determines the enforceability of the Agreement. Plaintiffs' request for summary judgment on DHL's quantum meruit and open account counterclaims is denied.

## CONCLUSION

For the reasons stated above:

- Plaintiffs' Motion for Partial Summary Judgment on Issue Preclusion (Dkt. 400) is **GRANTED IN PART** and **DENIED IN PART**;

---

[187] In support of their argument, Plaintiffs also cite *U.S. ex rel. Roach Concrete, Inc. v. Veteran Pacific, JV*, 787 F. Supp. 2d 851 (E.D. Wis. 2011). This decision is unpersuasive in two respects. First, the court assumed for the purposes of its analysis that the underlying contract was enforceable. Here, questions remain as to the enforceability of the Agreement. Second, although the court dismissed the claim, the court invited an amendment to the pleadings if the contract was later found to be void or unenforceable. *Id.* at 859-60.

- DHL's Motion for Partial Summary Judgment on Plaintiffs' Contract Claims (Counts II, III, and IV) (Dkt. 402) is **GRANTED IN PART** and **DENIED IN PART**; and

- Plaintiffs' Motion for Partial Summary Judgment on DHL's Second, Third, and Fourth Counterclaims (Dkt. 399) is **GRANTED IN PART** and **DENIED IN PART**.

SO ORDERED this 28th day of July, 2015.

BY THE COURT:

_____

ROBERT J. SHELBY
United States District Judge